## RISK *v.* THOMPSON.

[No. 29,630. Filed January 27, 1958. Rehearing denied February 24, 1958.]

*Robert H. Orbison* and *Baker & Orbison,* of counsel, of Indianapolis, for appellant.

*Sherwood Blue* and *James C. Courtney,* both of Indianapolis, for appellee.

PER CURIAM.—This case comes to us on petition to transfer from the Appellate Court under §4-215, Burns' 1946 Replacement. See 143 N. E. 2d 116 for opinion of the Appellate Court.

In January 1954 the appellant Risk and appellee Thompson were partners, engaged in the operation of two taverns; the Turf Bar, managed by appellee Thompson, and the Horizon Room, managed by appellant Risk. The partners were having difficulties, including some financial troubles. They decided to separate and attempt to divide the partnership assets. For that purpose they met in the office of Mr. Sherwood Blue, attorney for appellee. Also present at the time was Mr. Robert H. Orbison, attorney for Mr. Risk, and Mrs. Thompson, wife of appellee. The conference resulted in a memorandum taken down in long-hand by

attorney Blue and initialed and signed by the parties and Mrs. Thompson with reference to the division of the property and an arrangement for separation. This memorandum is as follows:

### "EXHIBIT 'A'

"Thompson-Risk            Jan. 20—1954

"Risk will buy the Thompson ½ int in Horizon Room for

"(1) 50 sh com stk in Turf Bar Inc.
       Assign his

"(2) ~~Conveyance~~ o̶f̶ undivided ½ int. in real est contract covering re in which Turf Bar is located, subject to liens & encumbrances of record—

"(3) (Harley Underwood owns the r.e. subject to a $20 M mtge to Ralph Alexander—T-R bought 100 shs T B Inc for $25 M and agreed to pay $50 M for R.E.—They borrowed 15 M from Merch Nat. to pay Harley Underwood—applied v. total of 75 M reducing bal to 60 M which is being pd @ 600 per mo. This transaction took place May 5/53. Pmts are up to date—) Risk would not object to a new cond. cont between U & Ths.—May need Underwood's consent to assignment.

"(4) Risk to pay $6000 to boot by giving his note—secured by chattel mtge—on Horizon Room equip & inventory—pay at rate of $250.00 per mo. direct to Merch. & to be applied on Merch. note of 15 M (12 M bal) beginning Feb. 20, 1954, with int @ 4½% (or equal amt with Merchant's note) WOR—usual form—

"(5) Assignment by Ths to Risk of ½ int in Horizon Room and dissolution of partnership agreement.

"(6) Mutual exchange of indemnity agreements each releasing the other from any liab. for a/c payable on business operations. ~~(a) Auditor's statement of all a/c pay & statement of liabilities.~~ Assumption to be as of a certain date for cut off purposes—

"(7) Cooperation in execution of all necessary papers—to affect transfers of all interests including licenses issued by ABC—

"(8) Each to have privileges of first refusal in event the other shall wish to sell the business & use of the name.—

/s/
M.T.

/s/
F.Risk                          /s/  Mildred Thompson
/s/                             /s/  Ferris Risk
WHT                             /s/  WHT"

The appellee brought suit upon this memorandum, claiming that it was a contract. In one paragraph of the complaint he asked specific performance and in the second paragraph asked damages for breach of the alleged contract. The trial court found for the appellee and entered a decree for specific performance. Appellant claims (1) That the evidence is undisputed that the memorandum was not intended as a final contract by the parties and that it is deficient and uncertain as to certain elements therein necessary for a binding contract; (2) That the court, because of the uncertainty in the contract, could not decree specific performance; and (3) In addition, by reason of a receivership of part of the partnership assets here involved (the Horizon Room) instituted by appellee, specific performance was made impossible.

There are certain parts of the evidence that are undisputed. The parties were competently and fully represented by legal counsel at the time the memorandum was made. The legal significance therefore attached to the memorandum by the respective attorneys is important and, in fact, binding upon the parties as their agents.

Mr. Orbison stated in substance "My understanding of the memorandum agreement of January 20th was simply this: that it was a rough draft of notes made

at the meeting, that the final agreement was to be reduced to writing and all of the terms approved by both parties before there was any valid contract."

At the conclusion of the January 20th meeting Mr. Blue stated he would reduce his long-hand notes to a typed form and send it to Mr. Orbison for drafting an agreement in complete formal language. When Mr. Blue sent the memorandum to Mr. Orbison it was entitled by Mr. Blue as follows: "PROPOSAL AND OUTLINE OF BASIS FOR SALE BY THOMPSON AND WIFE OF THEIR ONE-HALF INTEREST IN THE HORIZON ROOM TO FERRIS RISK." Mr. Orbison attempted to draft two formal contracts which were submitted to the appellee and his attorney, but no formal contract was ever executed by the parties.

Appellant says that the memorandum as it was written in Mr. Blue's office was defective in constituting a contract in the following particulars:

(1) It failed to fix "a certain date for cut off purposes" of the obligations of each of the taverns and the assumption of separate operations by each of the parties. Appellee seeks to meet this point by urging that after the memorandum was made, Risk took over the exclusive operation of the Horizon Room and Thompson the Turf Bar. However, it should be pointed out that each was previously managing the same places respectively. A continuation of a previous existing condition is not the basis for any inference there has been a change. *Waymire et al.* v. *Waymire* (1895), 141 Ind. 164, 40 N. E. 523.

(2) The memorandum provided for the assignment of Risk's one-half interest in the real estate contract on which the Turf Bar was located. The memorandum stated "May need Underwood's consent to the assignment." Underwood was the owner

and seller. The consent was necessary for Risk's release from liability under the contract. The "consent" was never waived or obtained. The parties recognized the consent of Underwood as a factor in the final agreement yet to be agreed upon. The court has no right to determine whether the parties desired this consent or did not desire this consent. It was left undetermined by the parties. Parties may agree with certainty on certain parts of a contract and leave other parts or items to be completed. Until all particulars are agreed upon there is no contract even though a court may feel such incomplete items are not important or desirable.

The memorandum further provided that the appellee should assign to the appellant Risk one-half interest in the Horizon Room, which included a lease that had about eighteen months to run. This also involved Thompson's release from liability under the lease. The evidence shows, without dispute, that the owner of the building refused to consent to such an assignment. The testimony is as follows:

"Q. Would you have had any objection to Mr. Ferris Risk operating the Horizon Room and complying with all the terms of the lease?

"A. I don't know whether I can answer that. I have nothing against Mr. Risk or Mr. Thompson operating it. I would have objections to either one operating it by themselves over the way they were operating it.

. . .

"Q. If Mr. Risk, on the other hand, had transferred his interest in this lease to Mr. Thompson and he operated the Horizon Room and paid all the rents, you wouldn't have been hurt?

"A. And done the business the two of them could have done.

"Q. It was immaterial which one operated the business or both of them as long as they paid the rent?

"A. No, sir, that is not correct.

"Q. What would have been—

"A. (Interposing) I don't think either one would have had the ability to work at it as well as the two of them working at it.

"THE COURT: You got gross and you wanted the two of them to operate it?

"THE WITNESS: That's correct.

. . .

"Q. You would not have permitted either one of them to get off the lease?

"A. That is correct."

It is clear from the evidence that not only did the appellee fail to make and tender an assignment of his interest in the lease on the Horizon Room to the appellant as part of his obligation, but that he could not have obtained the consent of the landlord to such an assignment. Part of the consideration of this lease was the rental based upon "the gross" of the business owned and operated by two persons rather than one. This landlord considered it a valuable part of his lease, and a violation of it a breach of the lease.

(3) The third point made by the appellant, and it appears to us to be an insurmountable barrier to the remedy of specific performance in this case, is the fact that after the memorandum was made between the parties, and while there was still contention between them, on June 3, 1954 the appellee asked for and with the consent of the appellant had a receiver appointed for part of the property of the partnership, namely: the Horizon Room. This was the asset which, under the memorandum, was to go to the appellant Risk. The basis for the receivership was that the asset consisting of the Horizon Room was being wasted and likely to be lost.

The court appointed James C. Courtney receiver. He is one of the attorneys for the appellee, and the entry and order of the court recites he was appointed receiver "of the assets and business of William H. Thompson and Ferris Risk, doing business as the Horizon Room" and "That *said partnership business* consists of a restaurant and tavern which is an operating business at the present time." (Our italics) There would seem to be an inconsistency, therefore, in the court's decree when it considers the Horizon Room still partnership assets for the purpose of enforcing a receivership and yet the individual property of appellant Risk when sold and charged with a chattel mortgage of $6,000 (under the memorandum) which was in default. There is no evidence that Thompson, who asked for specific performance of the memorandum, ever tendered performance on his part by an assignment of his half-interest in the Horizon Room to Risk, thus making Risk the sole owner. Where the contract is executory the tender must be kept good by bringing the necessary instruments for the tender into court. *Goodwine* v. *Morey* (1887), 111 Ind. 68, 12 N. E. 82; *Sowle* v. *Holdridge et al.* (1878), 63 Ind. 213.

It is true a receivership may be proper when ancillary to an action for an accounting and dissolution of a partnership, but we know of no legal principle, and none is cited, which permits, in an action for specific performance, a receivership for the purpose of *disposing of property or liquidating assets when the specific performance of the alleged contract involves an exchange of those very assets*. We do not say a receiver may not be appointed to hold or preserve property *pendente lite*. That is not the case here. The receiver asked for and received authority to sell the Horizon Room and this was done. By such action it

was placed beyond the ability of both parties to carry out the alleged contract by assigning and delivering the Horizon Room to appellant Risk. Specific performance was made impossible. Risk could not receive the "specific performance" (Thompson's one-half interest in the Horizon Room) for which it is alleged he bargained. A court may not grant specific performance when the subject matter of the contract no longer exists or is beyond the control of the parties. *Louisville, New Albany and Chicago R. W. Co.* v. *Bodenschatz* (1895), 141 Ind. 251, 39 N. E. 703; *Cline* v. *Strong* (1913), 52 Ind. App. 286, 100 N. E. 569. By the election of a remedy inconsistent with specific performance the right thereto has been waived. 81 C. J. S., Specific Performance, §22, pp. 454, 455.

On the other hand, the court, in an action for specific performance, could not decree the payments of money in installments over a period of time such as would have been necessary here by reason of a note to be paid in installments.

1. First, because it would require a protracted supervision and direction by the court for long periods of time.

2. Secondly, because to attempt an enforcement of the payments of the installments would result in imprisonment for debt in violation of a constitutional provision. Constitution of Indiana, Art. 1, §22.

3. Thirdly, because a suit at law for the debt with ancillary and supplementary remedies is adequate for the payment of money. 49 Am. Jur., Specific Performance, §69, p. 84.

The court's decree of specific performance, however, attempts to obviate this difficulty by decreeing that what remains of the proceeds from sale of the Horizon Room shall be paid to appellant Risk after deducting

therefrom the costs and the sum of $5310.94. The latter sum was ordered paid to appellee Thompson in lieu of the $6000.00 which, under the terms of the memorandum, Risk was to pay Thompson by giving his note payable at the rate of $250.00 a month. This, of course, is not specific performance of the contract made by the parties, but it appears to us to be one made by the court as a substitute.

Equity jurisdiction to compel specific performance is confined to specific property, usually real estate or personal property of a unique or peculiar nature or value. In the case of personal property it must be shown there was no adequate remedy at law. *Marion Trucking, Inc.* v. *Harwood Trucking, Inc.* (1954), 125 Ind. App. 1, 116 N. E. 2d 636; 81 C. J. S., Specific Performance, §66, p. 570; 49 Am. Jur., Specific Performance, §125, p. 146.

> "The contract must be capable of being specifically enforced, and be of a nature that the court can decree its complete performance against both parties without adding to its terms." *Louisville, New Albany and Chicago R. W. Co.* v. *Bodenschatz, supra* (1895), 141 Ind. 251, 263, 39 N. E. 703 at p. 707.

Appellant Risk, under the memorandum, was entitled to pay this indebtedness at the rate of $250.00 a month; not to have it discounted and be forced to pay it in cash out of the sale of his assets. A court may not make a contract for the parties. It may not substitute its own ideas for any of the terms or conditions of a contract.

The evidence is undisputed that the minds of the parties failed to meet on all details of any complete contract. It lacks certainty necessary for a complete meeting of the minds of the parties. The attorneys for each considered the memorandum

when first drawn only as a start or beginning for a contract—not one that was completed.

"With respect to its essential elements, the qualities of completeness, certainty and fairness, the contract set out in the complaint does not present the requisites warranting a decree for specific performance. Courts can only proceed in cases like this when the parties have themselves agreed upon all the material and necessary details of their bargain. If any of these are omitted, or left obscure and undefined, so as to leave the intention of the parties uncertain respecting the substantial terms of the contract, the case is not one for specific performance." *Ikerd et al.* v. *Beavers* (1886), 106 Ind. 483, 485, 7 N. E. 326; *Burke* v. *Mead* (1902), 159 Ind. 252, 64 N. E. 880.

Not only did appellee Thompson fail to tender and perform all his part of the obligation, but in asking for a receivership and the sale of the Horizon Room he thereby forestalled any possibility of a specific performance of the contract which covered a transfer of the Horizon Room to appellant Risk. By asking and getting a receivership of the Horizon Room and causing it to be sold, the parties abandoned any agreement involving its exchange as part of the consideration of such an alleged agreement. It may be urged that appellant Risk agreed to this receivership. It is true. That, however, is consistent with his position throughout that there never was a contract. In such event the only remedy left is a dissolution of the partnership and an accounting between the parties.

The judgment of the trial court is reversed with instructions to sustain the motion for a new trial.

Bobbitt, J., not participating.

NOTE.—Reported in 147 N. E. 2d 540.