**HERITAGE DEVELOPMENT OF INDIANA, INC. Appellant,**

v.

**OPPORTUNITY OPTIONS, INC.; David A. Carter; Warren E. Stibbins, Trustee of the Warren E. Stibbins, M.D., Inc. Profit Sharing Trust; Warren E. Stibbins; David A. Carter and David E. Quimby; Carter, Quimby, Schemmel & Associates, Inc., Pension Plan; and G & C Real Estate Holdings, LLC, Appellees.**

No. 29A05–0112–CV–541.

Court of Appeals of Indiana.

Aug. 26, 2002.

Steven C. Earnhart, Thrasher Buschmann, Griffith & Voelkel, Indianapolis, IN, Attorneys for appellant.

Erick D. Ponader, Mary T. Doherty, Sommer & Barnard Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Heritage Development of Indiana, Inc., ("Heritage") plaintiff below, appeals the Hamilton County Superior Court's grant of summary judgment in favor of Opportunity Options, Inc. ("Opportunity Options"); David A. Carter, individually ("Carter"); Warren E. Stibbins, Trustee of the Warren E. Stibbens, M.D., Inc. Profit Sharing Trust; Warren E. Stibbens, individually ("Stibbens"); David E. Quimby ("Quimby"), individually; Carter, Quimby, Schemmel & Associates, Inc. Pension Plan; Carter, Quimby, Schemmel & Associates, Inc. (collectively, "the Appellees"); and G & C Real Estate Holdings, LLC ("G & C").[1]

We affirm.

### Issues

Heritage presents the following consolidated issues for our review: (1) whether the trial court erred by striking portions of the affidavit of Heritage vice president Dean P. McFarland ("McFarland"), and (2) whether the trial court erred by entering summary judgment in favor of the Appellees.

### Facts and Procedural History

On July 18, 2000, following discussions between Heritage and Carter, Heritage executed a Purchase Agreement in which Heritage offered to purchase 110 acres of real estate from several individuals and entities identified in the agreement. The Agreement identified the selling owners as Opportunity Options; Stibbens, both individually and as trustee of the Warren E. Stibbens, M.D., Inc. Profit Sharing Trust; Carter; and Quimby. The real estate was divided into two parcels. One of the parcels, described as "Parcel A", consisted of eighty acres located in Hamilton County, and the other, described as "Parcel B", consisted of thirty acres located in Hancock County. While Hamilton and Han-

---

1. G & C is not a party to this appeal.

cock Counties border each other, it appears that the parcels were not contiguous. Heritage offered to buy the parcels for $20,000 per gross acre, for an estimated $1,600,000 for Parcel A, and $600,000 for parcel B. Closing on the deal was to occur not later than 190 days after the date the Agreement was accepted.

The Agreement provided that Heritage's offer to buy the property would expire if not accepted by July 28, 2000. On July 21, 2000, Carter executed the acceptance page of the Agreement on behalf of himself individually, on behalf of Opportunity Options as its president, and for Carter, Quimby and Associates, Inc. as its president. According to Carter and the other appellees, however, Carter did not own the property, and Quimby and Associates had been administratively dissolved by the Indiana Secretary of State in 1990. In fact, the two parcels did not have the same owners. Rather, Carter and the rest of the appellees · state that Parcel A, the Hamilton County property, was owned by Opportunity Options, Stibbens (both individually and as trustee of the above-identified trust), and by the Carter, Quimby, Schemmel & Associates, Inc. Pension Plan (of which, according to the appellees, Carter was a trustee). Parcel B, the Hancock County property, was evidently. owned solely by Opportunity Options. Heritage does not dispute the Appellees' claims in this regard. Thus, of the true owners of the two parcels, only Opportunity Options executed the Agreement.

On December 14, 2000, Heritage received a commitment for title insurance for the parcels. The commitment apparently revealed the true identities of the owners of the respective parcels, as well as the fact that, unknown to Heritage, Carter's Opportunity Options sold the Hancock County property to G & C without Heritage's knowledge on October 23, 2000. On

December 18, 2000, Heritage filed a complaint and a lis pendens notice in Hancock County seeking damages and specific performance of the Purchase Agreement with respect to Parcel B. Heritage then filed a similar action in Hamilton County the next day, also seeking damages and specific performance of the purchase agreement with respect to Parcel A.

On December 20, 2000, Carter met with Heritage vice president McFarland and tendered a proposed Amendment to Purchase Agreement. The Amendment again identified the "seller" as Opportunity Options, Stibbens (both individually and as trustee of the Warren E. Stibbens, M.D., Inc. Profit Sharing Trust), Carter, and Quimby. According to the proposed Amendment, Carter and his associates acknowledged that "Buyer and Seller entered into a certain Purchase Agreement dated July 18, 2000," and requested that the Agreement be modified to apply only to Parcel A, the Hamilton County property. Despite identifying the individuals and entities listed above as the selling owners, the Amendment provided signature lines for Carter as president of Opportunity Options, for Stibbins (both individually and as trustee) and for Carter and Quimby as trustees of the Carter, Quimby, Schemmel & Associates, Inc. Pension Plan. (App. 279–280.) The Amendment was signed by Stibbins, both in his individual capacity and as trustee, and by Carter and Quimby as trustees. Thus, the Amendment was signed by the remaining owners of the Hamilton County parcel who had not signed the Purchase Agreement. Carter does not appear to have signed the Amendment as president of Opportunity Options. McFarland refused to accept the Amendment, but reiterated that Heritage remained willing to close on both parcels pursuant to . the Purchase Agreement. The parties apparently went back and forth, with Carter offering to sell the Ham-

ilton County property alone, and Heritage refusing to proceed unless both parcels were available.

On May 17, 2001, the Appellees filed their Motion for Summary Judgment and supporting materials. The Appellees argued that the Purchase Agreement was unenforceable pursuant to the Statute of Frauds, and that even if the Agreement was enforceable, Heritage was not entitled to specific performance because Heritage refused to purchase the Hamilton County parcel when it was offered. Heritage responded on July 19, 2001. Among the items Heritage designated was McFarland's affidavit. In his affidavit, McFarland stated that Carter told Heritage that Carter was an owner of both parcels, and that he represented the other owners. McFarland further stated that Carter told Heritage that the other owners of the parcels were Opportunity Options, Stibbins (again, both individually and as trustee of his trust), and Quimby, and that Heritage drafted the Purchase Agreement on the basis of Carter's representations. Finally, McFarland stated that when Carter executed the Purchase Agreement on behalf of himself, Opportunity Options and Carter, Quimby and Associates, Inc., he told Heritage that he was authorized to sell the parcels on behalf of the other owners, and that he would subsequently obtain their signatures. The Appellees moved to strike the portions of McFarland's affidavit containing these assertions on the ground that the affidavit failed to establish that McFarland had personal knowledge of the matters in question.

The trial court heard the Appellees' summary judgment motion on August 17, 2001. On October 22, 2001, the trial court granted the Appellees' motion to strike portions of McFarland's affidavit as well as the Appellees' motion for summary judgment. On November 16, 2001, the trial

court entered final judgment against Heritage. Heritage now appeals.

## Discussion and Decision

### I. McFarland's Affidavit

#### A. Standard of Review

■ The trial court has broad discretion in ruling on the admissibility of evidence. *McClyde v. Archdiocese of Indianapolis*, 752 N.E.2d 229, 235 (Ind.Ct.App.2001). This discretion extends to rulings on motions to strike affidavits on grounds that they fail to comply with the summary judgment rules. *See id.*

#### B. Analysis

■ Trial Rule 56(E) of the Indiana Rules of Trial Procedure provides that affidavits submitted in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The appellees contend that the trial court properly struck the following paragraphs of McFarland's affidavit:

4. Through the course of negotiations of the purchase of Parcel A and Parcel B, Defendant David A. Carter ("Carter") represented to agents of Heritage that he "owned" Parcel A and Parcel B. Furthermore, Carter represented that he "represented" other owners of Parcel A and Parcel B.

5. Through the course of negotiations of the purchase of Parcel A and Parcel B, Carter represented to Heritage that the "owners" of Parcel A and Parcel B were: Opportunity Options, Inc., an Indiana Corporation; Warren E. Stibbens, Trustee of the Warren E. Stibbins, M.D. Profit Sharing Trust of Delaware County, State of Indiana; Warren E. Stibbens of Delaware County, State of

Indiana; and David A. Carter and David E. Quimby of Marion County, State of Indiana.

6. After lengthy negotiations between Heritage and Carter, and based upon Carter's specific representations as to the "owners" of Parcel A and Parcel B, a purchase agreement was drafted. Through the course of negotiations, Carter made no distinction nor did Carter suggest that there were different owners for Parcel A and Parcel B . . . . .

. . . .

8. On July 21, 2000, Carter individually and as the officer of Opportunity Options, Inc., executed the Agreement. At the time of executing the Agreement, Carter represented to Heritage that he had the authority to sell Parcel A and Parcel B on behalf of the other owners. Furthermore, Carter represented to Heritage that he would obtain the signatures of the other named sellers of Parcel A and Parcel B.

(App. 250–251.) The appellees particularly argue that there was no indication in the affidavit that McFarland had personal knowledge of the facts he was relating, and contend further that the evidence McFarland presented was inadmissible hearsay. We conclude that the trial court did not abuse its broad discretion by striking the paragraphs in question because the court could have sustained an objection to McFarland's testimony at trial had he testified in the form presented in the affidavit.

■ Trial Rule 56(E)'s requirement that an affidavit must "set forth such facts as would be admissible in evidence," means that "affidavits should follow substantially the same form as if the affiant were giving testimony in court." *McClyde*, 752 N.E.2d at 234. While McFarland specifically indicates in other paragraphs of his affidavit that Carter made statements directly to

him, McFarland asserts in the paragraphs in question only that Carter made statements to Heritage. The implication is clearly that Carter made the statements in question to other individuals and that McFarland obtained the information second-hand. If so, McFarland's statements would have been hearsay in that they represented the out of court statements of the source of the information, offered to prove the truth of the matter asserted therein. *See* Ind. Evid. R.801(c). Heritage does not argue upon appeal that McFarland's affidavit testimony was not hearsay or was admissible to an exception to the hearsay rule. We note, however, that Evidence Rule 801(d) excludes from the blanket definition of hearsay a party's own statement, in either an individual or representative capacity, that is offered against the party. Had McFarland's affidavit simply repeated statements by Carter received by McFarland first hand, Rule 801(d) would have applied. The trial court here, however, was entitled to conclude that McFarland's affidavit related statements obtained from an unidentified third-party, and the court could have sustained an objection to McFarland's testimony had it been presented at trial in its affidavit form. The trial court therefore did not abuse its considerable discretion in striking the paragraphs in question.

## II. Summary Judgment

### A. Standard of Review

Pursuant to Rule 56(C) of the Indiana Rules of Trial Procedure, summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. When reviewing a decision to grant summary judgment, this court applies the same standard as the trial court. *Best Homes, Inc. v. Rainwater*, 714 N.E.2d 702, 705 (Ind.Ct.App.1999).

We must determine whether there is a genuine issue of material fact requiring trial, and whether the moving party is entitled to judgment as a matter of law. *Id.* Neither the trial court nor the reviewing court may look beyond the evidence specifically designated to the trial court. *Id.*

A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *American Management, Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 428 (Ind.Ct.App. 1996). Once the moving party satisfies this burden through evidence designated to the trial court pursuant to Trial Rule 56, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Best Homes, Inc.*, 714 N.E.2d at 706 (*quoting Barnes v. Antich*, 700 N.E.2d 262, 264–65 (Ind.Ct.App. 1998)).

### B. Analysis

#### 1. Statute of Frauds

As noted above, the Appellees moved for and were granted summary judgment on the grounds that the Purchase Agreement was unenforceable because it was not signed by all of the owners of the property. The Statute of Frauds, Indiana Code section 32-2-1-1, provides in part that "[n]o action shall be brought ... upon any contract for the sale of lands ... [u]nless the promise, contract or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized...." Heritage argues that the trial court erred by entering summary judgment because there is a factual dispute regarding whether Carter was authorized to bind the non-signing owners of the Hamilton County property to the Purchase Agreement without their signatures, and because regardless of Carter's authority to act for the other owners, Carter and the other owners affirmed the contract in their proposed Amendment to the Purchase Agreement.

#### a. Carter's Authority to Bind the Non Signing Owners

In general, a principal will be bound by a contract entered into by the principal's agent on his behalf only if the agent had authority to bind him. *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675 (Ind.2001). The agent's authority to enter into a contract on his principal's behalf will typically be either actual or apparent.[2] Actual authority exists when the principal has, by words or conduct, authorized the agent to enter into a contract for the principal. *Id.* Apparent authority, on the other hand, exists where the actions of the principal give the contracting party the reasonable impression that the agent is authorized to enter into an agreement on behalf of the principal. *Id.* The question of whether an agency relationship exists and of the agent's authority is generally a question of fact. *Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind.Ct.App.1997), *trans. granted* and *summarily affirmed*, 688 N.E.2d 1250 (Ind.1997).

In this case, Heritage did not designate any evidence showing that the non-

---

**2.** A third category, inherent authority, which may arise as a result of the customary authority of a person involved in a particular kind of agency relationship, *see Gallant*, 751 N.E.2d at 675, does not appear to be applicable here.

signing owners did anything to give Heritage the reasonable impression that Carter was acting as their agent, and there was accordingly no triable issue regarding Carter's apparent authority. The evidence Heritage designated, however, demonstrates the existence of a genuine factual dispute about whether Carter had actual authority to execute the purchase agreement on behalf of the non-signing owners.

■ It is well settled that the existence of an agency relationship or an agent's authority may not be predicated solely upon the declarations of the alleged agent. *Johnson*, 679 N.E.2d at 510 n. 4. Thus, the properly stricken portion of McFarland's affidavit stating that Carter told Heritage that he represented the other owners in the transaction would not have been sufficient to establish a factual dispute about Carter's alleged actual authority. Similarly, the fact that Carter signed the Purchase Agreement in his individual capacity as a "Seller," when the Agreement provided that "Seller is the owner of the fee simple title to the Real Estate and/or is duly authorized and empowered to sell such Real Estate," (App. 56.), cannot create a question of fact about Carter's actual authority.

■ Nevertheless, an agent's authority may arise by implication and may be shown by circumstantial evidence. *Id.* In addition to McFarland's affidavit, Heritage designated the proposed Amendment to the Purchase Agreement tendered by Carter and the non-signing owners. In the proposed Amendment, the remaining owners stated that they had "entered into a certain Purchase Agreement dated July 18, 2000" in which the owners had agreed to sell Heritage "approximately 110 acres ... divided into two parcels, Parcel 'A', consisting of approximately 80 acres, and Parcel 'B', consisting of approximately 30 acres." (App. 274.) The proposed Amendment supports the inference that the non-signing owners acknowledged that they entered into the Purchase Agreement when Carter alone signed it on July 18, 2000, and thus that the remaining owners had in fact authorized Carter to enter into the Purchase Agreement on their behalf in the first place. Whether Carter was in fact so authorized is a question for trial, and summary judgment should not have been granted on the ground that the Purchase Agreement was not signed by all of the owners.

### b. Ratification

■ Even in the absence of a genuine issue of fact regarding Carter's authority to enter into the Purchase Agreement on behalf of the other owners, a question of fact existed with regard to the owners' possible ratification of the Purchase Agreement. A principal will be bound by a contract entered into by the principal's agent on his behalf regardless of the agent's lack of authority if the principal subsequently ratifies the contract as one to which he is bound. *See Beneficial Mort. Co. of Indiana v. Powers*, 550 N.E.2d 793, 796 (Ind.Ct.App.1990). Very generally, ratification may be express, where the principal explicitly approves the contract, or implied, where the principal does not object to the contract and accepts the contract's benefits. *See id.* This Court has explained the concept of ratification more particularly:

'Ratification means the adoption of that which was done for and in the name of another without authority. It is in the nature of a cure for [lack of] authorization. When ratification takes place, the act stands as an authorized one, and makes the whole act, transaction, or contract good from the beginning. Ratification is a question of fact, and ordinarily may be inferred from the conduct of the

parties. The acts, words, silence, dealings, and knowledge of the principal, as well as many other facts and circumstances, may be shown as evidence tending to warrant the inference or finding of the ultimate fact of ratification.... Knowingly accepting benefits of an unauthorized employment amounts to a ratification of such contract of employment, and is in the nature of an estoppel to deny the authority to make such contract. Ratification by a corporation may be shown by conduct, without any formal action of its board of directors. Corporations act only by and through their officers and agents, and ratification may be inferred from affirmation, or from passive acquiescence or from the receipt of benefits with knowledge. Knowledge, like other facts, need not be proved by any particular kind or class of evidence, and may be inferred from facts and circumstances....'

*State ex rel. Guaranty Building & Loan Co. v. Wiley,* 100 Ind.App. 438, 196 N.E. 153, 154 (1935) (quoting *National Life Ins. Co. v. Headrick,* 63 Ind.App. 54, 112 N.E. 559, 561 (1916)) (internal citations omitted).

As noted above, the proposed Amendment to the Purchase Agreement, in which the non-signing owners appear to have affirmed that they entered into the Purchase Agreement, supports the inference that Carter was authorized to enter into the Purchase agreement on behalf of the non-signing owners. The Amendment alternately supports the inference that even if Carter was not so authorized, the non-signing owners subsequently expressly ratified the contract as their own. Whether the owners ratified the agreement was also a question of fact.

### 2. Heritage's Refusal to Close on the Hamilton County Parcel

The Appellees argue that they were entitled to summary judgment on Heritage's claim for specific performance regardless of any questions of fact involving the enforceability of the Purchase Agreement under the Statute of Frauds because Heritage refused to close on the Hamilton County property when that parcel was offered independently of the Hancock County parcel. Heritage, as noted above, refused to close on the Hamilton County property alone on the basis of Heritage's assertion that the Agreement called for the purchase of both properties as part of a single transaction for the entirety of the real estate. The Appellees argue that the Purchase Agreement was severable with regard to each of the two parcels, and contend that the refusal to sell the Hancock County parcel did not relieve Heritage of its contractual obligation to proceed to closing on the Hamilton County parcel.

A single instrument executed by the same parties may contain separate and independent contracts. *See Stoneburner v. Fletcher,* 408 N.E.2d 545, 549 (Ind. Ct.App.1980). As a general rule, the failure of a distinct part of a contract does not void valid, severable provisions. *See* 17A C.J.S., Contracts, § 331, p. 308. The thrust of the Appellees' argument is essentially that because the Agreement was severable between the two parcels, Heritage was contractually obligated to close on the Hamilton County parcel regardless of any breach by the Appellees with regard to the Hancock County property, and that by failing to close on the Hamilton County parcel when it was offered, Heritage itself breached the Agreement as it related to the Hamilton County property and was therefore precluded from seeking specific performance or damages with regard to that parcel. *See Vawter v. Bacon,* 89 Ind. 565, 569, 1883 WL 5576 (1883) (noting that a party seeking specific performance must fulfill his own performance obligations un-

der the contract), and *Licocci v. Cardinal Associates, Inc.*, 492 N.E.2d 48, 52 (Ind.Ct. App.1986) ("A party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party . . . .").

Heritage does not take issue with the validity of the Appellees' claim in general. Heritage argues, however, that the Purchase Agreement was not severable between the two parcels, but rather called for the sale of both the Hamilton and Hancock County properties as part of a single deal for all the real estate. Heritage accordingly reasons that the offer to sell just the Hamilton County property in no way satisfied the Purchase Agreement.

 The proper meaning of the terms of a written contract is a question of law for the court. *Barrington Management Co. v. Paul E. Draper Family Ltd. Partnership*, 695 N.E.2d 135, 140 (Ind.Ct. App.1998). A court must, to the extent possible, recognize and enforce the intention of the parties as it is expressed in the unambiguous language used in the document. *See Ruff v. Charter Behavioral Health System of Northwest Indiana, Inc.*, 699 N.E.2d 1171, 1176 (Ind.Ct.App.1998). In reviewing the plain language of a contract to ascertain the parties' intent, the court should not read particular words and phrases in isolation; rather, the court should consider the contract as a whole and should avoid rendering any words, phrases or terms ineffective or meaningless. *Barrington . Management*, 695 N.E.2d at 140. Ultimately, the court should favor a conclusion regarding the parties' intent that harmonizes the contract's provisions as opposed to one that causes the provisions to conflict. *Id.*

The usual test of the severability of a contract is the entirety or divisibility of the consideration; and whether a contract is entire or divisible is controlled by the intention of the parties as it is disclosed by the terms of the contract. It is well established that the parties to a contract intend that it be entire and indivisible when by its terms, nature and purposes it contemplates and intends that each and all of its parts, material provisions and the consideration, are common each to the other and interdependent, or whether it could be completed in part only.

*Samper v. Indiana Dept. of State Revenue*, 231 Ind. 26, 106 N.E.2d 797, 802 (1952).

The Appellees point to provisions of the Purchase Agreement relating to the price of the real estate as evidence of the parties' intention that the Agreement was severable with regard to the two parcels. In particular, the Appellees note that the Purchase Agreement provides as follows:

14. Closing:

. . .

 b. The closing price per acre of Parcel "A" shall be $20,000 per gross acre as defined herein, or an estimated total of $1,600,000 (multiplied by 80.00 gross acres, more or less). Parcel "B" shall close at $20,000.00 per gross acre as defined herein, or an estimated total of $600,000.00 (multiplied by 30.00 gross acres, more or less).

(App. 71.) The Appellees also point to various provisions indicating that the parties contemplated the possibility of separate closings:

Seller has paid or will pay *prior to each Parcel closing*, through the · current year, all taxes, charges, debts, and other assessments due by the Seller with respect to the Real Estate; . . .

. . .

The possession of *any portion of the Real Estate being closed* shall be delivered to Buyer *on each Closing Date*, as is herein defined . . . .

. . .

At the closing, Seller shall deliver to Buyer ... [a] duly executed and acknowledged General Warranty Deed conveying good and indefeasible title in fee simple to *that portion of the Real Estate then being purchased,* free and clear of any and all liens, ... [a]n Owner's Policy of Title Insurance (the "Title Policy") issued by a reputable title insurance company chosen by Seller (the "Title Company") in the full amount of the purchase price for *the portion of the Real Estate being purchased,* dated as of closing, insuring Buyer's fee simple title to *such portion of the Real Estate* to be good and indefeasible .... [a]n assignment of Seller's rights in any leases, contracts, agreements, consents, easements, covenants, and other rights appurtenant to or relating to *that portion of the Real Estate then being purchased....*

. . .

At the Closing, Buyer shall ... [p]ay the cash portion of the Purchase Price for *that portion of the real estate being purchased* in the form of a certified bank check or bank wire transfer....

(App. 56–76) (emphasis added). According to the Appellees, these provisions show that the parties intended that the two parcels could close independently of one another for separately defined consideration, and that the Purchase Agreement was therefore severable.

Heritage responds by noting that while the agreement contemplates the possibility of separate closings on the two parcels, the Agreement consistently refers to the property being sold as "the Real Estate," a term the Agreement defines as "real estate consisting of approximately 110 acres, more or less...." (App. 49.) For example, the Agreement provides that "Buyer desires to purchase and Seller desires to sell the Real Estate subject to certain conditions precedent...." (App. 49.) Similarly, the Agreement states that "Seller agrees to sell and Buyer agrees to purchase on terms and conditions set forth below the Real Estate...." (App. 49.) None of the terms of the Agreement apply particularly to either parcel individually; rather, all of the many contract provisions apply uniformly to the "Real Estate." Moreover, the agreement provides for only a single payment of earnest money, rather than two separate payments for each parcel.[3]

The plain language of the Purchase Agreement supports each side's respective positions. On the one hand, the Agreement clearly contemplated the possibility that each parcel might close indepen-

---

**3.** Heritage also argues that provisions in the Purchase Agreement regarding financing show that the Agreement was interdependent and indivisible. Specifically, Heritage points to the following paragraph:

SELLER FINANCING: Seller agrees to provide Buyer with subordinated financing on Parcel "B", as is herein defined, in the amount of $450,000; which note shall have a term of not more than sixty (60) months from the date of initial closing and shall bear interest at the rate of ten (10.0%) percent per annum. Interest shall be paid within ten days following the end of each calendar year, prorated as required to coincide with dates herein. The payoff of the aforementioned note shall coincide with the

closing of a development loan for Parcel "B" (the 30 acre parcel south of 96th Street) as is described herein, or sixty months from the date of initial closing, whichever shall occur first.

(App. 51.) According to Heritage, the parties understood that the owners were to provide $450,000 in financing to Heritage, which was to be secured by the Hancock County parcel but subordinate to Heritage's first mortgage on the property. Heritage states that it was understood that Heritage would use the $450,000 to finance its purchase of both parcels, and claims that without the financing, the agreement as a whole could not be performed. This may well have been what the parties intended, but this intention is not ex-

dently and for separate consideration.[4] On the other hand, various provisions of the Agreement, particularly those defining the property to be sold as the entire 110 acres of real estate, indicate that the parties intended for both parcels to ultimately be sold as part of a single deal. We accordingly conclude that reasonable persons would find the Purchase Agreement susceptible of more than one construction, and that the Purchase Agreement is therefore ambiguous with regard to its severability. *See Salin Bank and Trust Co. v. Review Bd.,* 698 N.E.2d 1, 5 (Ind.Ct.App. 1998). Typically, this would present a question of fact for the trial court. *See id.* In this case, however, the ambiguity is resolved as a matter of law by virtue of Heritage's decision to separately and simultaneously enforce the provisions of the Purchase Agreement as they related to the Hamilton and Hancock County parcels respectively in different courts through independent lawsuits.

 As noted above, Heritage simultaneously pursued two separate actions in the Hamilton and Hancock County courts to enforce the provisions of the contract. Each suit sought specific performance of the provisions of the Purchase Agreement as they related to the parcel of land located within the county in which each separate action was instituted, as well as damages for the alleged breach of the respective provisions. Heritage's decision

to pursue independent actions to separately enforce the provisions of the Purchase Agreement as they related to the separate parcels amounts to a judicial admission that the Purchase Agreement was capable of separate and independent performance with regard to each parcel, and was therefore severable. *See Waugh v. Kelley,* 555 N.E.2d 857, 859 (Ind.Ct.App.1990) ("A judicial admission ... is conclusive upon the party making it.") and *Indiana State Hwy. Comm'n v. Vanderbur,* 432 N.E.2d 418, 422 (Ind.Ct.App.1982) (noting that pleadings can form the basis of a judicial admission). We therefore conclude as a matter of law that the Purchase Agreement was severable as between the two separate parcels. Accordingly, when Heritage refused to close on the Hamilton County property when it was offered, Heritage failed to perform under the Agreement, and was precluded from seeking specific performance or damages related to the Hamilton County parcel. *See Vawter,* 89 Ind. at 569, and *Licocci,* 492 N.E.2d at 52. The Appellees were therefore entitled to summary judgment on Heritage's request for specific performance and damages.[5]

## Conclusion

In conclusion, the trial court did not abuse its broad discretion by striking the portions of McFarland's affidavit in question here because McFarland's affidavit testimony appeared to contain hearsay.

---

pressed in the above provision, and we may not look beyond the terms of the agreement to ascertain its meaning.

4. Of course, given the fact that the Agreement was for the sale of two separate parcels of real estate owned by different individuals and entities, the two parcels could not have closed simultaneously. Thus, the fact that the parties understood that the parcels would close separately for different consideration does not itself establish that the parties intended that the Purchase Agreement was severable to the extent that only one of the parcels might ultimately be sold.

5. The Appellees would have been entitled to summary judgment even if the Purchase Agreement were not severable. As noted above, it appears undisputed that Opportunity Options sold the Hancock County parcel to G & C on October 23, 2000. If so, then Heritage would not be entitled to specific performance of the portion of the Purchase Agreement as it related to the Hamilton County parcel, the relief requested in the Hamilton County case at issue here, because the agreement between the parties for the sale of both the Hamilton County and Hancock County parcels as part of a single deal would be

However, issues of fact regarding Carter's actual authority to execute the Purchase Agreement on behalf of the other owners, and issues of fact regarding the owners' possible ratification of the Agreement regardless of Carter's authority, precluded the entry of summary judgment against Heritage on the ground that the contract was invalid under the Statute of Frauds. The Appellees were nevertheless entitled to summary judgment because the Purchase Agreement was severable as between the two separate parcels. Heritage was therefore obligated under the Agreement to proceed to closing on the Hamilton County property regardless of the sale of the Hancock County property to G & C, and by failing to do so, Heritage was precluded from seeking specific performance or damages under the Purchase Agreement as it related to the Hamilton County parcel.

Affirmed.

NAJAM and ROBB, JJ., concur.

ultimately impossible to perform. "A court may not grant specific performance when the subject matter of the contract no longer exists or is beyond the control of the parties." *Risk v. Thompson*, 237 Ind. 642, 147 N.E.2d 540, 545 (1958). Thus, unless a contract for the sale of real estate is capable of being performed, it cannot be specifically enforced. *Cline v. Strong*, 52 Ind.App. 286, 100 N.E. 569, 569 (1913). If Opportunity Options sold the Hancock County property to an unrelated third party, the subject matter of the contract would be beyond the control of the parties, *see Alexander v. Dowell*, 669 N.E.2d 436, 440 (Ind.Ct.App.1996) (noting that a trial court may not enforce a contract against one who is neither a party to or in privity to a contract), and the Purchase Agreement for the sale of the entire 110 acres of real estate would have been impossible to perform.

It appears, however, that the Hamilton Superior Court would not have had jurisdiction over this case in the first place if the purchase agreement was not severable. If the Purchase Agreement was not severable, then Heritage's two separate actions to enforce the indivisible Agreement were essentially the same case. As noted above, the Hancock County action was filed first. A court acquires jurisdiction over a case when it is filed with the court, and when the same case has been filed in two or more courts, the jurisdiction of the first court to acquire jurisdiction, which is the court in which the case is first instituted, is deemed exclusive. *Pivarnik v. Northern Indiana Public Service Co.*, 636 N.E.2d 131, 135 (Ind.1994).

We do not speculate as to the possible outcome of this case had Heritage simply filed a single action in one or the other of the two trial courts.