

FILED

Apr 06 2016, 9:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Terry K. Hiestand
Hiestand Law Office
Chesterton, Indiana

ATTORNEY FOR APPELLEE

Jere L. Humphrey
Wyland, Humphrey & Clevenger, LLP
Plymouth, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Larry J. Jernas and
R & R Horse Haven, Inc.,

*Appellants*,

v.

Kevin J. Gumz,

*Appellee*.

April 6, 2016

Court of Appeals Case No.
75A03-1511-CC-1903

Appeal from the Starke Circuit Court

The Honorable William E. Alexa, Special Judge

Trial Court Cause No.
75C01-1106-CC-192

**Brown, Judge.**

R & R Horse Haven, Inc., ("R & R") and Larry J. Jernas appeal the trial court's ruling in favor of Kevin J. Gumz and raise three issues on appeal which we consolidate and restate as whether the court's order is clearly erroneous. We affirm.

### Facts and Procedural History

R & R and Gumz entered into an Agreement to Sell Real Estate (the "Agreement") dated December 11, 2009. The Agreement provided that it was made "between R & R Horse Haven , Seller, of 7491 S 100 W, City of North Judson, State of IN , and Starke County, Buyer, of 7491 S 100 W, City of North Judson, State of IN ."[1] Plaintiff's Exhibit 3; Defendant's Exhibit 1. The Agreement further provided in part:

> 3. [R & R] agrees to pay [Gumz] the sum of $ 800,000 , which the Seller agrees to accept as full payment. This Agreement, however, is conditional upon [R & R] being able to arrange suitable financing on the following terms at least thirty (30) days prior to the closing date for this Agreement: a mortgage in the amount of 0 , payable in 0 monthly payments, with an annual interest rate of 0 percent.[2]
>
> 4. The purchase price will be paid as follows:
>
> Earnest deposit (upon signing this Agreement) $ 25,000

---

[1] The underlined portions were handwritten on blank spaces/lines provided on a pre-printed form Agreement to sell real estate. Gumz, Jernas, and Mary Wodrich indicated at trial that Gumz was the seller of the property and R & R was the purchaser of the property.

[2] The numbers were also handwritten on blank spaces/lines in the Agreement. Also, the dollar amounts were handwritten on blank spaces/lines in sections 3, 4, and 5 of the Agreement and the date and time were handwritten on the blank spaces/lines in section 6.

Other deposit: _____                        $ _____

Cash or certified check on closing                     $ _____

(subject to any adjustments or prorations on closing)

    Total Purchase Price                               $ 800,000

5. [Gumz] acknowledges receiving the Earnest money deposit of $ 25,000 from [R & R]. If [R & R] fails to perform this Agreement, [Gumz] shall retain this money. If [Gumz] fails to perform this Agreement, this money shall be returned to [R & R] or [R & R] may have the right of specific performance. If [R & R] is unable to obtain suitable financing at least thirty (30) days prior to closing, then this money will be returned to [R & R] without penalty or interest.

6. This Agreement will close on  Jan 5 2010 , at   2   o'clock, at _____, City of _____, State of _____.

*Id.* The Agreement was signed by Mary H. Wodrich on behalf of R & R.[3] In addition, a check dated December 10, 2009, was written by Larry Jernas[4] made payable to Gumz in the amount of $25,000. The handwritten note in the memo line of the check stated "Down payment horse farm" and "R & R." Plaintiff's Exhibit 2.

---

[3] Wodrich's signature appears near the top of the first page of the Agreement rather than at the end of the document or on a prepared signature line. An exhibit admitted at trial listed Wodrich as the chair of the board of directors of R & R. The Agreement does not include a signature by Gumz.

[4] An exhibit listed Jernas as the vice-chair of the board of directors of R & R.

However, the sale of the property to R & R did not occur, and Gumz later sold the property to another purchaser. Gumz did not return the $25,000 deposit to R & R or Jernas.

In June 2011, Jernas and R & R filed a complaint against Kevin Gumz and Amy Gumz alleging in part that, in the fall of 2009, R & R "reached an agreement with Kevin Gumz to purchase the Horse Farm for the price of $500,000"; that Jernas paid $25,000 to Kevin Gumz on behalf of R & R as an earnest money deposit for the purchase of the property; that after the down payment was made and on or about December 11, 2009, Kevin Gumz presented the Agreement to R & R "which listed the price as $800,000 and included the Trailer Home belonging to the Gumzes" and provided the Agreement was contingent on R & R "being able to arrange suitable financing"; that after signing the contract, R & R diligently pursued financing but was unable to obtain suitable financing at the increased price; and that the Gumzes failed to return the earnest money deposit to R & R or Jernas. Defendant's Exhibit 2 at 1-2. The complaint alleged counts of breach of contract, fraud, conversion, and unjust enrichment.

Jernas and R & R filed a motion to amend the complaint in October 2013, which the court granted in December 2013. The amended complaint eliminated Amy Gumz as a party and alleged in part that Kevin Gumz was at all relevant times the owner of real estate located at 7491 S 100 W, North Judson, Indiana (defined in the complaint as the Horse Farm); that, in the fall of 2009, R & R "believed it had reached a parole [sic] agreement with Kevin

Gumz to purchase the Horse Farm for the price of $500,000"; that Jernas paid $25,000 to Gumz on behalf of R & R as an earnest money deposit for the purchase of the property; that after the down payment was made and on or about December 11, 2009, Gumz presented the Agreement to R & R "which listed the price as $800,000" and provided the Agreement was contingent on R & R "being able to arrange suitable financing"; that on or about January 2010, R & R notified Gumz of its inability to obtain suitable financing and requested that Gumz return the earnest money deposit; and that Gumz failed to return the earnest money deposit. Appellants' Appendix at 11-12.

[6] The amended complaint, under Count I, titled Debt Due, alleged in part that the Agreement "was never an enforceable contract because it omits essential terms of an enforceable contract since the description of the Real Estate is incomplete and the document was not properly executed by both parties"; that "[a]s a consequence of the invalidity of [the Agreement], Gumz held the $25,000 deposited as a trustee pending the execution of an enforceable contract which was never prepared, presented, or signed"; and that, when R & R and Jernas requested the $25,000 deposit be returned, Gumz indicated that he had spent it. *Id.* at 12-13. Count II of the amended complaint, titled Unjust Enrichment, alleged that Gumz would be unjustly enriched if not required to repay the earnest money deposit to Jernas and R & R. R & R and Jernas requested a judgment against Gumz in the amount of $25,000 and attorney fees, prejudgment interest, and the costs of the action.

[7] Gumz filed a counterclaim alleging that R & R entered into the Agreement, that it breached the Agreement, that he later sold the property for $400,000 and had been damaged in the amount of $400,000, that R & R previously acknowledged the validity of the Agreement by suing on it in its original complaint, and that it has waived any statute of frauds compliance, and Gumz demanded judgment in the amount of $400,000, prejudgment interest, costs, and all other proper relief.

[8] On July 15, 2015, the court held a bench trial at which it heard testimony from, among others, Jernas, Wodrich, and Gumz. Jernas testified that, when Gumz was approached about the sale of the property, "the $500,000 figure was thrown out to our group," that Jernas asked his banker if R & R could obtain a loan for that amount, that his banker told him that R & R could be financed for up to $500,000, that he wrote a check for $25,000 and gave it to Wodrich, who planned to meet with Gumz, and that at the time he wrote the check he had no reason to believe that the sale price was different than $500,000. Transcript at 24. Jernas testified that later, after learning the Agreement was for $800,000, he called Gumz several times and requested that his deposit be returned, and Gumz told him that he had already spent it.

[9] Bruce Shanks, Jernas's banker, testified that Jernas told him that he found Gumz's property for $500,000 for forty acres plus a house and outbuildings, that Shanks went to look at the buildings and house and based on what he could see he felt the collateral would be strong enough to pursue a loan for $500,000, that Jernas later called him and said that the price had changed to

$800,000, and that created a "different challenge because . . . the collateral value is going to have to go up higher" and that "[u]ntil we had an official purchase agreement, I wasn't going to pursue it anymore." *Id.* at 44. When asked if the bank had a commitment to consider financing more than $500,000, Shanks testified "[w]ell, that would all be determined by the appraisal," that "I could have got an approval of the loan but it still is subject to the appraisal," and "you don't want to spend the money for an appraisal until I felt confident the purchase order was with in line, everybody had signed it, and everybody was committed to a set price." *Id.* at 44-45. When asked if his bank ever looked at lending more than the $500,000, Shanks replied "No." *Id.* at 46.

[10]  Wodrich testified that she visited the property,[5] that Gumz wanted to keep a track of woods behind the farm to keep as his hunting grounds, and that her group "did not like that idea because of using horses and veterans" and "[h]orses might spook at gunshots, not a very good idea." *Id.* at 51. She testified that she was present with Gumz and Jernas when a price of $500,000 was discussed, that she took Jernas's check to meet with Gumz, that Gumz had the Agreement "all ready," that Gumz never mentioned that he was asking for $800,000 rather than $500,000, and, when asked if she had an opportunity to read the document before she signed it, that "[i]n my enthusiasm to sign it, I just went ahead and signed it." *Id.* at 55. When asked if she had the money,

---

[5] The then-treasurer of R & R's board of directors indicated that she toured the property with Wodrich and Gumz. Wodrich testified that, the first time she went to the property, she went with Jernas and that, a few weeks later, she went with R & R's treasurer as well as two others.

she said that Jernas "said he would fund it for us until we got grants." *Id.* at 52. When later asked about a meeting in October with Gumz, Wodrich testified that she and others looked at the house, the barns, and the arena, that Gumz "said he could come down to our price at $500,000," and that Gumz "still wanted to keep that part of the woods and we still said no." *Id.* at 61. When asked "you knew who the seller was," she replied "I knew who the seller was." *Id.* at 62. When asked why she thought she was signing, she testified that she "was very enthusiastic at the time and it just meant a lot of hopes and dreams was going be fulfilled with that place." *Id.*

[11] Kevin Gumz testified that Wodrich and several others met him at the property and that they walked all the barns, the arena, and the house. He testified "[w]e talked about that they didn't want all the property, only wanted part of it," that "[s]o we kind of walked where they would like to square it off to separate the property off," and that they "talked about the price of what that would be. That it would be 800,000." *Id.* at 65. He testified that Wodrich visited him at the property shortly after that and stated she wished to purchase the property and that she visited again a couple of weeks later with others, at which time the group walked through the barns to figure out how they were going to change things to fit their needs.

[12] He testified that Wodrich later called him to say she wanted to buy the property and that the next day, December 11, 2009, he met her and two women with her and brought a form land purchase agreement which he had bought at Staples,

he wrote the contract out,[6] Wodrich signed it, she gave him the deposit check, and she "said they had the money, it was taken care of, and we would close as soon as we could." *Id.* at 69. He testified he told Wodrich that he was going to a title company where the closing would occur to have the legal documents prepared, that he had filled in "the amount of zero" in the blank spaces in the agreement for the amount of the mortgage, the amount of the monthly payments, and the annual interest rate, and when asked why he did so, stated "[s]he told me that they had the money and that it wasn't an issue, they didn't need any financing," and "[t]hat they had it and they wanted to close as soon as we can." *Id.* at 69-70.

[13] Gumz testified that Jernas later called him and asked why he changed the price and that he responded that the price had never changed and had always been $800,000. He testified that he and Wodrich walked the property, that he placed some flags "where she wanted it section it off," and he had said he would "move a fence over to that so there would be a property line on the fence dividing the front part on the back 90 acres." *Id.* at 71. Gumz testified that the closing was scheduled for January 5th, that Jernas called him on New Year's Eve and said that R & R was not going to purchase the property and to send his check back to him, and that he told "him no because I had to – we did move the fence and stuff. I did the survey work. We did the legal work already. I hired

---

[6] Gumz first stated "I wrote the contract out" and then later in his explanation stated "[w]e filled it out." Transcript at 68-69. He stated that he "put the zeros" in the blanks of the Agreement. *Id.* at 69. In his cross-examination, he said "I wrote it out." *Id.* at 79.

movers because the house was fully furnished at that time." *Id.* at 72. He testified that, two years later, he sold the property to another purchaser for $400,000.[7] When asked why the property was worth $800,000 in 2009 and $400,000 in 2011, Gumz testified that real estate prices had really gone down, that with the way banking had changed obtaining loans had become really hard, that the property was going to sit there and not be insured because it was vacant, that he was still paying property taxes and for heating and electric, and that when he found someone who had the cash it was time to stop the bleeding and sell the property.

[14] When asked on cross-examination how he knew what R & R was purchasing, Gumz testified "[b]ecause when [Wodrich] and the two ladies were out there before, like I said, we walked and put stakes on the property line where they wanted it to be, what they were interested in buying, and not buying the whole 141 acres," "[t]hey didn't want the back part because they said they couldn't afford that much," and "so we walked the property line and put flags and I said that's where we would -- I would have the survey to and move the fence to that property line." *Id.* at 80. He stated forty acres were being purchased, that he knew the acreage after the property was surveyed, and that at the time of the Agreement he did not know the exact acreage but he "had measured it off and guessed it at about 40 acres." *Id.* at 81. He testified "[t]hey said that's where

---

[7] Defendant's Exhibit 7 is a title insurance commitment related to the 2011 sale of property owned by Gumz which provides a legal description of the insured property indicating the land contained 39.23 acres more or less.

they want it," "we never really talked about exact acres," "[w]e said this is the property line. This is where we flagged it off, put stakes," "[w]e'd move the fence up to that because she said – [Wodrich] wanted it fenced in," and "[s]o we fenced it in so that way, that would be where the property was and when the survey people came out, they surveyed it to that." *Id.* at 81-82. He indicated he installed the fence in mid-December and that he hired three people to help him.

[15] Wodrich was recalled to the stand and, when asked about the property R & R was purchasing and the property that would be remaining, testified that "[t]here was a boundary of woods in the back of that one barn, the last barn there" and that "[h]e wanted to keep that for his hunting." *Id.* at 89. When asked "did you go with him and put any stakes out where there might be boundaries," Wodrich testified "[he] showed me, yes, but there was nothing staked out there." *Id.* When asked what she meant, she testified "[h]e drove me out there in a golf cart and he showed me where the boundaries was that he wanted." *Id.* When asked "this was something that was agreed or understood that for $500,000, you were getting to that point," Wodrich testified "[w]e did not want that done because, like I said, the guns and the hunting would square [sic] the horses, and this was discussed with the board of directors." *Id.* When asked if the matter of Gumz keeping the woods had been resolved by the time she gave him the $25,000 deposit, she testified "[h]e had agreed he wasn't going to use – . . . [h]e had supposedly agreed that he wasn't going to use that." *Id.* at 91. When asked "[s]o then it had been resolved," she stated "[t]hat had been

resolved" and that "[o]therwise, I wouldn't have never give him that check." *Id.* at 91-92.

[16] The court also admitted documentary evidence which included the Agreement, Jernas's check, R & R's bylaws, a title commitment related to Gumz's 2011 sale of the property, and an advertisement for the sale of the property, which Gumz indicated ran after the deal with Jernas fell through, stating "40 Acres of fenced pasture and paddocks," "custom brick ranch home," and "$795,000 – well below the appraised value." Defendant's Exhibit 4.[8]

[17] On October 6, 2015, the court entered Findings of Facts and Conclusions of Law. The court found that R & R and Gumz had entered into a contract for the property, that the Agreement "between R & R and [Gumz] gives a location of the land, and this is sufficient for a description of the land," that "even though R & R was listed as the seller, both parties knew who was selling and who was purchasing the land," that although the Agreement "was only signed by one party, it was signed by the appropriate party, the party charged with the sale," and that "[a]s the [A]greement gave an adequate description of the property, the parties knew their roles in the [A]greement and the party who was charged was the party who signed, the . . . [A]greement is a valid contract." Appellants' Appendix at 8.

---

[8] This exhibit also contains a summary of a listing with an entry date of March 8, 2004 and expiration date of February 8, 2006, for property located at 7491 S 100 West, North Judson, Indiana, consisting of 141 acres, and which showed a list price of $1,680,000.

[18] The court further concluded that the Agreement "clearly states that the $25,000 is in the form of earnest money," that it provided that "if the buyer fails to perform this Agreement, the Seller shall retain this money," and that Gumz "is entitled to keep the earnest money and could seek [ ] other damages from R & R." *Id.* at 8-9. The court noted that Gumz chose to waive other damages and limit his recovery to the earnest money already paid and that, should Jernas seek recourse for his $25,000 earnest money, he may seek it from R & R as he paid the money on its behalf.

## *Discussion*

[19] The issue is whether the judgment of the trial court that an enforceable agreement existed between R & R and Gumz and that Gumz is entitled to retain the earnest money deposit is clearly erroneous. When a trial court enters findings of fact and conclusions thereon, findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. *Id.* First, it must determine whether the evidence supports the trial court's findings of fact, and second it must determine whether those findings of fact support the trial court's conclusions. *Id.* Findings will only be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by

inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.* We review questions of law *de novo* and owe no deference to the trial court's legal conclusions. *M.K. Plastics Corp. v. Rossi*, 838 N.E.2d 1068, 1075 (Ind. Ct. App. 2005). Interpretation of a contract presents a question of law. *Stewart v. TT Commercial One, LLC*, 911 N.E.2d 51, 55 (Ind. Ct. App. 2009), *trans. denied*.

[20] Jernas and R & R contend that in Indiana a contract for the sale of real estate is required by the statute of frauds to be totally in writing to be enforceable, and that a contract which is partly written and partly oral is a parol contract and does not satisfy the statutory requirement of a written contract. They then assert that the alleged Agreement is defective in several aspects, including: it lists R & R as the seller; Gumz is not listed anywhere in the Agreement, did not sign it, and therefore could not be bound to it; there was a total lack of a legal description which could be used to determine whether the Agreement was for forty acres, ninety acres or some other acreage; the signature of Wodrich appears randomly on the document; and no reference to signing in any capacity under R & R was made nor was it signed by any other representatives of R & R as required by its bylaws. They further argue that, if the alleged Agreement was enforceable, the court erred when it did not consider the language related to the buyer obtaining suitable financing. They also assert unjust enrichment in that Gumz neglected to bring to their attention that he had deviated from the

parties' understanding of selling the property for $500,000 and then refused to return the $25,000 deposit that this requires the imposition of a constructive trust, and that the trial court should have awarded them attorney fees.

[21] Gumz maintains that the Agreement's reference to R & R as the seller rather than the purchaser is nothing more than a scrivener's error and that the testimony shows that the parties knew the identity of the seller. He argues that the Agreement was signed by R & R's authorized agent, that Wodrich had the authority to act on behalf of R & R, and that the court found the description of the property to be adequate, the address of the property was given, and Wodrich testified she was satisfied with the forty acres and there was no uncertainty to her. Gumz further argues that his signature was not required for him to be able to enforce the Agreement, and that the Agreement need be signed only by Wodrich as R & R's agent to be enforceable against R & R under the statute of frauds. He also asserts that Jernas and R & R have forfeited their request for a constructive trust as it is raised for the first time on appeal, and that Jernas has no cause of action as he loaned the money to R & R.

[22] If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Lily, Inc. v. Silco, LLC*, 997 N.E.2d 1055, 1064 (Ind. Ct. App. 2013) (citing *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 252 (Ind. 2005)), *reh'g denied*, *trans. denied*. Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id.* We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* A

contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. *Stewart*, 911 N.E.2d at 56 (citations omitted); *see also McDivitt v. McDivitt*, 42 N.E.3d 115, 117 (Ind. Ct. App. 2015) (a contract may be ambiguous if its terms are susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning), *trans. denied*. A contract is not ambiguous merely because the parties disagree as to its proper construction. *Stewart*, 911 N.E.2d at 56. When interpreting a contract, our paramount goal is to ascertain and effectuate the intent of the parties. *Id.* This requires the contract to be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. *Lily*, 997 N.E.2d at 1064 (citing *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010)). When a contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the fact-finder. *Id.*; *see also McDivitt*, 42 N.E.3d at 117 (when a contract is ambiguous, extrinsic evidence may be examined to determine the parties' reasonable expectations). When a contract contains general and specific provisions relating to the same subject, the specific provision controls. *Ryan v. Lawyers Title Ins. Corp.*, 959 N.E.2d 870, 875 (Ind. Ct. App. 2011).

[23] To the extent R & R and Jernas cite to the Indiana Statute of Frauds and argue the Agreement is defective, we note that the Statute of Frauds "does not govern the formation of a contract but only the enforceability of contracts that have

been formed." *Schuler v. Graf*, 862 N.E.2d 708, 712-713 (Ind. Ct. App. 2007) (citing *Fox Dev., Inc. v. England*, 837 N.E.2d 161, 165 (Ind. Ct. App. 2005)), *trans. denied*; *Owens v. Lewis*, 46 Ind. 488, 518 (1874) (noting an agreement that is not in writing, although required to be in writing by the statute of frauds, is not invalid, and that the statute only inhibits actions to enforce the agreement); *see also* 14 Richard R. Powell, *Powell on Real Property* § 81.02[1][a] (Michael A. Wolf ed. 2000) (noting that "the statute of frauds affects the enforceability of contracts that have not yet been performed" and that the writing requirement "is generally viewed as crucial to the enforceability of a contract, but not necessarily to its validity").

[24] Contracts are formed when parties exchange an offer and acceptance. *Fox Dev.*, 837 N.E.2d at 165 (citing *Rosi v. Bus. Furniture Corp.,* 615 N.E.2d 431, 435 (Ind. 1993)). A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract. *Id*. The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction. *Morris v. Crain*, 969 N.E.2d 119, 123 (Ind. Ct. App. 2012); *Fiederlein v. Boutsells*, 952 N.E.2d 847, 856 (Ind. Ct. App. 2011). There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract. *Bennett v. Broderick*, 858 N.E.2d 1044, 1048 (Ind. Ct. App. 2006), *trans. denied*.

[25] In addition, to be valid and enforceable, a contract must be reasonably definite and certain. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind.

2012) (citing *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 813 (Ind. 2009); RESTATEMENT (SECOND) OF CONTRACTS § 33 (recognizing that in order to give effect to a contract, its terms must be "reasonably certain")); *Wenning v. Calhoun*, 827 N.E.2d 627, 629 (Ind. Ct. App. 2005) ("In order to be enforceable, a contract must be reasonably definite and certain in its material terms so that the intention of the parties may be ascertained."), *trans. denied*. Only "reasonable" certainty is necessary; "absolute certainty in all terms is not required." *Allen*, 980 N.E.2d at 310 (citing *Conwell,* 906 N.E.2d at 813). Only essential terms need be included to render a contract enforceable. *Conwell,* 906 N.E.2d at 813. The existence of a contract is a question of law. *Morris*, 969 N.E.2d at 123; *Fox Dev.*, 837 N.E.2d at 165.

[26] The Indiana Statute of Frauds requires that contracts for the sale of real property be in writing. *Fox Dev.*, 837 N.E.2d at 166. Specifically, the Statute, found at Ind. Code § 32-21-1-1, provides that a person may not bring an action involving a contract for the sale of land unless the contract "is in writing and signed by the party against whom the action is brought or by the party's authorized agent." The Statute is intended to preclude fraudulent claims that would probably arise when one person's word is pitted against another's and that would open wide the floodgates of litigation. *Fox Dev.*, 837 N.E.2d at 166. Nevertheless, oral contracts for the sale of real property are voidable, not void. *Id.*; *see Owens*, 46 Ind. at 518 ("A contract that is required to be in writing by the statute of frauds is not invalid if made by parol. The statute only inhibits all actions brought to enforce it. It is only voidable, and not void.") (citations and

internal quotation marks omitted). Further, the writing must contain the agreement's essential terms and, as to a description of land, must "furnish the means of identification." *Schuler*, 862 N.E.2d at 713 (citation omitted); *Blake v. Hosford*, 180 Ind. App. 175, 181, 387 N.E.2d 1335, 1340 (1979), *reh'g denied*.

[27] To address the claims of R & R and Jernas related to whether Gumz and R & R entered into a reasonably definite agreement, we note that R & R and Jernas do not argue that the parties did not exchange an offer and acceptance or point to testimony or evidence suggesting Wodrich or Gumz did not intend to enter the Agreement on December 11, 2009. The evidence shows that Gumz, as the seller of the property, agreed to be bound by the terms of the Agreement. While Gumz did not sign the Agreement, he purchased the form land purchase agreement, wrote in the blank spaces of the form to complete the terms of the Agreement, and met with Wodrich to obtain her signature and to accept the earnest money deposit. These actions evidenced Gumz's intent to enter into and be bound by the terms of the Agreement. *Knapp v. Beach*, 52 Ind. App. 573, 101 N.E. 37, 38 (1913) (noting a contract signed by one party may become binding upon both only if it is accepted and acted upon by the party not signing). Turning to Wodrich's signature, the fact the signature appears near the identification of R & R as a party to the Agreement rather than near the end of the document or on a prepared signature line does not mean that her signature was invalid as evincing R & R's intent to be bound by the terms of the Agreement. *See Globe Acc. Ins. Co. v. Reid*, 19 Ind. App. 203, 47 N.E. 947, 951 (1897) ("Ordinarily, written obligations are executed by signing the names of

the parties to be bound thereby at the bottom or close of the instrument. But this method of execution is not essential to the validity of the instrument.") (citing *McMillen v. Terrell*, 23 Ind. 163, 167 (1864)), *reh'g denied*.

[28] In addition, as the president of R & R and chair of its board of directors, Wodrich, by her conduct, including several visits to Gumz's property with other representatives of R & R and discussions regarding the property and her meeting with Gumz to sign the Agreement and deliver the earnest money check, had apparent authority to enter into the Agreement on behalf of R & R. A reasonable person would believe Wodrich possessed the authority to act on behalf of R & R, and R &R and Jernas do not point to evidence to show they informed Gumz that any agreement with R & R regarding the sale and purchase of real property was required to be signed or otherwise ratified by other representatives of R & R under its bylaws.[9] *See Somerville Auto Transp. Serv., Inc. v. Auto. Fin. Corp.*, 12 N.E.3d 955, 967-968 (Ind. Ct. App. 2014) (concluding AFC reasonably believed that Merenciano was an agent of Somerville for the purpose of purchasing vehicles using the financing made available to Somerville by AFC pursuant to an agreement) (citing *Cain Family Farm, L.P. v. Schrader Real Estate & Auction Co., Inc.*, 991 N.E.2d 971, 978-979 (Ind. Ct. App. 2013) (holding that Cain Family Farm placed Candace in a position to perform acts appearing reasonable to a third person sufficient to

---

[9] A section of R & R's bylaws states that "Both the Treasurer and Executive Director shall sign all financial instruments, such as checks, issued from the Corporation." Plaintiff's Exhibit 1. Wodrich testified she was the president of R & R at the time she signed the Agreement.

endow her with apparent authority and that Candace had apparent authority to execute a purchase agreement)), *trans. denied*. Gumz and R & R entered into and agreed to be bound by the terms of the Agreement.

[29] With respect to the identification of the purchaser under the Agreement, to the extent the name "R & R" was handwritten into the blank space for the seller on the form purchase agreement rather than the blank space for the buyer, we note that the testimony of Jernas, Wodrich, and Gumz reflected their understanding that Gumz owned the real property which was the subject of the Agreement and was the seller, and this is consistent with the pleadings filed and the exhibits introduced by the parties. As to the description of the property, the Agreement referred to the street address of the property to be purchased and did not include a legal description. All that is required to render a contract enforceable is reasonable certainty in its terms. *Conwell*, 906 N.E.2d at 813. While the Agreement did not refer to a legal description and may not have expressly stated whether the parties intended to include a certain wooded area of Gumz's land, the trial court heard extensive testimony and admitted several documents regarding the property subject to the Agreement, and, based on the Agreement and the evidence, would have been able to determine with reasonable certainty the boundaries of the property which the parties intended to convey. The evidence demonstrates there was an understanding by the parties at the time of the Agreement as to the boundaries of the property to be conveyed. *See Schuler*, 862 N.E.2d at 715 (noting that the parties agreed to the location of the boundary as where a fence line or row of trees existed and

holding that the argument that there was not a meeting of the minds regarding the property boundary was without merit). We find R & R and Jernas's claims that the Agreement was invalid because it was indefinite or not properly executed to be unpersuasive.

[30] We also note that the Statute of Frauds does not preclude Gumz from enforcing the Agreement's deposit provisions against R & R. As noted, contracts for the sale of real property that do not satisfy the Statute of Frauds are voidable, not void. *Fox Dev.*, 837 N.E.2d at 166; *Owens*, 46 Ind. at 518; *see also* 14 Richard R. Powell, *Powell on Real Property* § 81.02[1][a] (noting courts treat a contract that is not enforceable under the statute of frauds as voidable, but not absolutely void, and that this distinction is important in part because an oral contract to convey real estate may be successful if the statute of frauds defense is not raised in the pleadings). The Statute of Frauds is an affirmative defense, and affirmative defenses must be specifically pled. *See* Ind. Trial Rule 8(C) ("A responsive pleading shall set forth affirmatively and carry the burden of proving: . . . statute of frauds . . . ."); *Joyner v. Citifinancial Mort. Co.*, 800 N.E.2d 979, 982 (Ind. Ct. App. 2003) (noting that affirmative defenses must be specifically pled). Generally an affirmative defense, including the affirmative defense of the statute of frauds, is waived by failure to raise it in the pleadings. *See E & L Rental Equip., Inc. v. Wade Const., Inc.*, 752 N.E.2d 655, 660 (Ind. Ct. App. 2001) (noting a party failed to plead the Statute of Frauds as an affirmative defense in its responsive pleading as required by Ind. Trial Rule 8(C) and thus waived the defense); *Uebelhack Equip., Inc. v. Garrett Bros., Inc.*, 408 N.E.2d 136, 140 (Ind.

Ct. App. 1980) (holding that the affirmative defense of the statute of frauds was waived because it was not raised until a motion for judgment on the evidence). In his counterclaim against R & R, Gumz alleged in part that R & R entered into the Agreement, breached the Agreement, previously acknowledged the validity of the Agreement, and waived any statute of fraud compliance, and Gumz requested all proper relief. In its answer to the counterclaim, R & R denied that the Agreement was a valid contract and stated in part "R & R denies waving [sic] any statute of frauds compliance." Appellants' Appendix at 33. We cannot say that R & R's answer specifically pled the Statute of Frauds as an affirmative defense under Ind. Trial Rule 8(C).

[31] Even assuming R & R did not waive its Statute of Frauds defense, we find that the Statute of Frauds does not prevent Gumz from enforcing the Agreement. The Statute provides that a person may not bring an action involving a contract for the sale of land unless the contract "is in writing and signed by the party against whom the action is brought or by the party's authorized agent." Ind. Code § 32-21-1-1. Gumz brought his counterclaim against R & R and the Agreement was signed by Wodrich on behalf of R & R. Thus, the Statute of Frauds is not a valid defense against Gumz's action to enforce the Agreement or its terms regarding the earnest money deposit. We also observe that the Statute of Frauds requires that the writing be signed only by the party against whom the action is brought and not by all parties to the agreement, and thus the fact that Gumz did not sign the Agreement does not render the Agreement unenforceable by him. *See* Ind. Code § 32-21-1-1; *Grabill Cabinet Co., Inc. v.*

*Sullivan*, 919 N.E.2d 1162, 1166 (Ind. Ct. App. 2010) (observing that only the party against whom the action is brought need sign the writing, that this proposition is well-settled in Indiana law, and that the Statute of Frauds has existed in substantially the same form for well over a century) (citing *Graham v. Henderson Elevator Co.*, 60 Ind. App. 697, 703, 111 N.E. 332, 335 (1916) (noting the memorandum must be signed by the defendant but need not necessarily be signed by the plaintiff)); *Foltz v. Evans*, 113 Ind. App. 596, 49 N.E.2d 358, 363-364 (1943) (collecting cases for the proposition that, under the statute of frauds, a contract which requires a signature by the party to be charged need be signed only by the party sued or to be charged); *Knapp*, 101 N.E. at 38 (noting that "[t]he general rule is that the statute [of frauds] is satisfied and the plaintiff may enforce the contract, if the writing is signed alone by the party sued, the defendant in the action, and is not signed by the plaintiff"); 14 Richard R. Powell, *Powell on Real Property* § 81.02[1][e][i] (noting that the crucial signature is that of the other contracting party; that the non-signing party generally is able to enforce a contract against the signing party even though if the situation were reversed the signing party would be prevented by the statute of frauds from enforcing the obligation of the non-signing party; that, if the defendant asserts an enforceable contract in a counterclaim, then the writing must contain the plaintiff's signature; and that a signature may fulfill the statute of frauds requirement even if it appears at the top of the document).

[32] Further, the Agreement adequately identified or provided a means of identifying the parcel to be conveyed to satisfy the Statute of Fraud's

requirement that the essential terms of the agreement be in writing. *See Schuler*, 862 N.E.2d at 714 (holding that the parties' agreement furnished the means of identification of the property; that, once so identified, the trial court could admit parol evidence to complete the legal description of the property; that there was testimony the parties walked the property and agreed on the boundaries; and that the parties' description was sufficiently definite to meet the statute's requirements); *Blake*, 180 Ind. App. at 181, 387 N.E.2d at 1340 (stating "it is not necessary that the contract by itself be sufficient to identify the land, but only that it furnishes the means of identification"); 14 Richard R. Powell, *Powell on Real Property* § 81.02[1][d][iii] (noting that a contract may be enforceable under the statute of frauds if it describes the property by its street address and that testimony of the parties is permissible to clarify the parties' intent as long as some basis for designating the property interest is included in the writing). In sum, even assuming R & R did not waive its affirmative defense of the Statute of Frauds, the Statute does not serve as a valid defense to the enforcement of the Agreement.

[33] Having determined the Agreement was enforceable against R & R, we now turn to the Agreement's terms regarding R & R's earnest money deposit. The Agreement unambiguously provided that R & R's $25,000 payment to Gumz constituted an earnest money deposit. Further, the pre-printed form language of paragraph 5 of the Agreement provides that, if R & R fails to perform, Gumz shall retain the deposit, except that, if R & R is unable to obtain suitable financing at least thirty days prior to closing, then the deposit would be returned

to R & R. However, the court heard Gumz's testimony that Wodrich told him that R & R did not need financing and that the language in the form agreement related to financing terms was not applicable. Gumz testified that, in the blank spaces in the Agreement setting forth the terms of suitable financing, he had filled in "the amount of zero" for the amount of the mortgage, the amount of the monthly payments, and the annual interest rate because R & R did not need financing and the section was not applicable to the contract. Transcript at 69. Paragraph 3 of the Agreement provides that the Agreement "is conditional upon [R & R] being able to arrange suitable financing on the following terms at least thirty (30) days prior to the closing date for this Agreement: a mortgage in the amount of __0__, payable in __0__ monthly payments, with an annual interest rate of __0__ percent." Plaintiff's Exhibit 3; Defendant's Exhibit 1. The handwritten "0" in the blanks support the conclusion that the parties did not intend that R & R's obligations under the Agreement be conditioned upon R & R obtaining financing. *See Ryan*, 959 N.E.2d at 874-877 (noting that it is well settled that, when interpreting a contract, specific terms control over general terms, that there was a discrepancy between the general pre-printed text of a purchase agreement and the more specific language in type filled in on the form purchase agreement, and that the specific filled-in language controlled over the more general pre-printed language). Additionally, the Agreement provided that the closing date was January 5, 2010, which was less than thirty days following the date of the Agreement, December 11, 2009, and this is also consistent with the determination the parties did not contemplate that R & R would need to obtain financing at least thirty days prior to closing. The trial court properly

concluded that, pursuant to the provisions of the Agreement governing R & R's earnest money deposit, R & R and Jernas are not entitled to a refund of the deposit.

[34] With respect to the request to impose a constructive trust on the deposit in favor of R & R and Jernas, we agree with the trial court that the parties' Agreement governs the earnest money deposit, and based on the record we cannot conclude that the court erred or abused its discretion in not finding that Gumz obtained the deposit from R & R through wrongful means or that Gumz would be unjustly enriched by retaining the deposit, and thus do not find the arguments of R & R and Jernas that a constructive trust must be imposed to be persuasive. *See Presbytery of Ohio Valley, Inc. v. OPC, Inc.*, 973 N.E.2d 1099, 1109 (Ind. 2012) ("Constructive trusts are generally imposed when legal title is gained through wrongful means (e.g., fraud, duress, undue influence, theft, etc.)."), *reh'g denied*, *cert. denied*, 133 S. Ct. 2022 (2013); *Leever v. Leever*, 919 N.E.2d 118, 122 (Ind. Ct. App. 2009) (noting "[a] constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it" and "[t]he duty to convey the property may arise because the property was acquired through fraud, duress, undue influence or mistake, or through a breach of a fiduciary duty or the wrongful disposition of another's property"). As we affirm the trial court's ruling in favor of Gumz, we cannot say the court erred or abused its discretion in failing to award attorney

fees to R & R and Jernas.  Neither R & R nor Jernas is entitled to a refund from Gumz of the earnest money deposit.

## *Conclusion*

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.


Kirsch, J., and Mathias, J., concur.