**FILED**

Jun 25 2020, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jeffrey M. Heinzmann
Heinzmann Law Office LLC
Fishers, Indiana

ATTORNEY FOR APPELLEE

Curtis E. Shirley, Esq.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brian K. Southard, *Appellant*, | June 25, 2020 |
| | Court of Appeals Case No. 19A-PL-2560 |
| v. | Appeal from the Hamilton Superior Court |
| Keltner Property Group, LLC, *Appellee*. | The Honorable Gail Bardach, Judge |
| | Trial Court Cause No. 29D06-1809-PL-9198 |

**Brown, Judge.**

Brian K. Southard appeals from the trial court's judgment in favor of Keltner Property Group, LLC ("Keltner Property" or "Plaintiff"). We affirm.

## Facts

In March 2013, "K & E KELTNER PROPERTY GROUP, LLC," as the landlord and "ABELARD LLC" ("Abelard") and Southard as the tenants entered into a lease related to real property on Main Street in Carmel, Indiana. Plaintiff's Exhibit 1-A at 1. The opening paragraph of the agreement states: "THIS LEASE, entered into by the K & E KELTNER PROPERTY GROUP, LLC, an Indiana limited liability company ('Landlord') and ABELARD LLC & Brian Southard – Social Security No. [Redacted] ('Tenant')."[1] *Id*. The term of the lease was for three years beginning on May 1, 2013, and the lease provided for rent increases in May 2014 and May 2015. At the end of the lease document and below the word "Tenant," Southard's signature appears and, on a line below his signature for his "Title," the word "Tenant" appears. *Id*. at 16. Kenneth Keltner ("Kenneth") signed the lease on behalf of K & E Keltner Property Group, LLC.

A lease dated January 29, 2015, was executed related to real property on Carmel Drive in Carmel, Indiana, and the opening paragraph of the agreement states:

---

[1] Brackets in exhibit.

> THIS LEASE, entered into by the KELTNER PROPERTY
> GROUP, LLC, an Indiana limited liability company ("Landlord")
> and Restor Company an Indiana [corporation], & Brian Southard –
> Social Security No. [Redacted] Tenant.

Plaintiff's Exhibit 1-B at 1.[2]  Kenneth and his son Eric Keltner ("Eric") were the owners of Keltner Property.  The lease form was similar to that used for the 2013 lease.  The term of the lease was for five years and began on February 1, 2015.  The lease provided that Tenant agreed to pay Landlord base annual rent payable in monthly installments as follows:

| Term | Annual Rent | Monthly Rent |
| --- | --- | --- |
| . . . Months 1-12[] | $45,104.46 | $3,758.71 |
| Months 13-24 | $60,104.12 | $5,008.68 |
| Months 25-36 | $61,684.26 | $5,140.36 |
| Months 37-48 | $63,306.94 | $5,275.58 |
| Months 49-60 | $64,971.28 | $5,414.27 |

*Id.* at 3.  In addition to base annual rent, the lease provided Tenant agreed to pay its proportionate share of certain other expenses including real estate taxes and operating expenses for the building and common area ("CAM").  It provided "[t]he current monthly CAM is $725.17."  *Id.*  The lease also provided that, upon the expiration or earlier termination of the lease, "Tenant shall surrender to Landlord the Leased Premises . . . broom clean and in the same order and condition in which Tenant received them."  *Id.* at 5.  The lease indicated that "[a]ny notices to be given hereunder shall be deemed sufficiently

---

[2] Brackets in exhibit.

given when . . . directed to the party to be notified at the following addresses . . . : If to Landlord at: Keltner Property Group, LLC . . . If to Tenant at: Brian Southard [personal address] . . . .” *Id.* at 14. The lease also provided: “If there is more than one Tenant, their obligation shall be joint and several.” *Id.* At the end of the lease document, the parties' signatures appear as follows:

Plaintiff's Exhibit 1-B at 17.

[4] Keltner Property received rent payments under the 2015 lease from February 2015 through August 2018.[3] However, following the first year of the lease term, Keltner Property continued to receive base rent payments equal to the amounts due during the first year of the term and which did not reflect the scheduled annual rent increases.[4]

---

[3] Kenneth indicated rent payments were received from Restor or one of Southard's other companies.

[4] Keltner Property presented an exhibit indicating the total amounts paid and shortages for each year of the lease term which indicated $53,800.08 was paid during the first three years of the lease.

[5]     On September 26, 2018, Keltner Property filed a Complaint for Breach of Lease Agreement against Southard and Restor Company ("Restor," and together with Southard, "Defendants") alleging they failed to pay installments of rent when due.

[6]     On August 22, 2019, the court held a bench trial at which it heard testimony from Kenneth, Eric, and Southard. The court also admitted twenty-three exhibits including the 2013 and 2015 lease agreements, photographs of the leased premises, invoices for services to clean and repair the premises, and attorney fee invoices. It also admitted an email message from Kenneth to Southard in January 2016 stating that February 1st was the anniversary of the lease and that, on that day, the lease would adjust such that base rent would be $5,008.68 and CAM would be $725.17. A reply from Southard to Kenneth Keltner stated: "Is there anyway we can keep my lease at its current level? There is no way I can afford this under the current circumstances . . . we are barely hanging on as it is. Please, lets [sic] discuss." Plaintiff's Exhibit 2.

[7]     Kenneth testified regarding meeting Southard in 2013, approaching him regarding renting the premises on Main Street, and the 2013 lease. He testified regarding his further discussions and negotiations with Southard regarding leasing the premises on Carmel Drive in 2015. In particular, he testified that Southard had concerns "about if things went south with his company" and that, as a result, he offered Southard an option which was incorporated into the agreement. Transcript Volume II at 13. He testified that, under the option, Southard "would have . . . 10 months in the new location to get adjusted to the

rent and also to see if business continued to grow, and also if it didn't, we would take a haircut, reduce the rent, and extend the months from 60 to 72."[5] *Id*. He indicated the option was required to be exercised by November 15, 2015, and Southard did not exercise the option. He testified that, after the 2015 lease was signed, he exchanged numerous emails with Southard concerning the lease and had a phone conversation regarding the scheduled rent increases. Kenneth testified that Southard had started a new company, "said he was running short," and "was writing checks from two different companies." *Id*. at 19. He testified regarding the amounts of unpaid rent, when the premises were vacated, the condition of and damage to the premises, the unauthorized alterations made to the premises, and the amounts expended to clean and repair the premises. Kenneth further testified as follows:

> Q. Did there come a time when this [2015] lease agreement . . . was listed on a bankruptcy petition by Restor where you had to show up in federal bankruptcy court?
>
> A. [Kenneth] I received a notice for bankruptcy court when Restor went into bankruptcy. I called Brian [Southard], and I said, "Brian, I'm not part of this bankruptcy because this is a lease with you as an individual. It's got nothing to do with Restor."
>
> Q. All right. Well, Restor and Mr. Southard were on the lease. Is that right?
>
> A. Correct.

---

[5] The lease agreement provided Tenant had the option to extend the term of the lease by one year, the option was required to be exercised by November 1, 2015, and in that event, the base annual rent for Months 13-24 would have been $46,644.12 and for Months 61-72 would have been $66,679.37. **(Ex at 32-33)**

Q. All right. And fair to say that you showed up in bankruptcy court, right?

A. Yes, sir.

Q. All right.

A. To protect my interest.

Q. I understand. And also fair to say that the lease agreement and your relationship with Mr. Southard was taken out of the bankruptcy process, specifically by the judge there?

A. Yes.

Q. Okay. All right.

A. At my request.

Q. I understand. And Mr. Southard was there?

A. Correct.

*Id*. at 38-39. On cross-examination, when asked "[i]s it fair to say that you're here seeking judgment today against Mr. Southard and not really actually Restor because Restor wouldn't be able to pay a judgment against it," Kenneth answered "[t]hat is correct." *Id*. at 39. When asked if he knew who "Becky Hintz" was, Kenneth replied "[a]n employee of Brian's," and when asked "[a]n employee of Brian's or an employee of Restor's," he answered "[s]ame difference. Brian is Restor." *Id*. at 44.

[8] Eric testified he signed the 2015 lease and delivered it to "Becky Heinz" at Restor's location, she indicated that Southard was not present but would sign the lease when he returned, he left the lease document with her, and it was later

delivered to his office. *Id*. at 46. He testified he later saw Southard in the parking lot and asked him if he had received the keys, Southard replied "[y]es. Did you get the lease," and he replied affirmatively. *Id*. at 48.

[9] Southard testified he lived in Carmel, was in the construction business, worked with Restor Group, LLC, and previously was the owner of Restor Property Restoration, LLC. He testified his signature was on the 2013 lease. When asked "you understood under that lease that you were personally liable for the obligations under that lease," he replied "[n]o, I didn't, but I've realized that since then." *Id*. at 52. He testified he and his business partner shut down Abelard, LLC, and he opened Restor Property Restoration, LLC. He indicated Kenneth "kept approaching us" about moving to the Carmel Drive location, they had discussions periodically through the fall of 2014, he was working from his Chicago office for almost all of 2014, he never told Kenneth he was ready to move to a new location, he was in Phoenix for the Super Bowl on the day Eric signed the 2015 lease, and he "hadn't even read it yet." *Id*. at 53, 55. When asked if his signature was on the lease, he replied: "No. It's my signature stamp that we use for checks." *Id*. at 55. He indicated no one in his office was authorized to use his signature stamp for anything other than checks. When asked, "[b]y the time you were done with Abelard, had your attitude about personal guarantees changed," he replied: "Absolutely. I never signed leases or supplier agreements with personal guarantees. Absolutely not." *Id*. at 56-57. He indicated Restor moved to the Carmel Drive premises while he was out of town and no one told him the move was happening at the time. He stated "the

first time I found out that we had an escalation of almost a thousand dollars from year to year was when Kenny and I talked about the first increase" and "that was shocking to me." *Id*. at 59. When asked if he signed the contract, he answered "I did not." *Id*. at 64. When asked "[w]hy did you keep paying 4883 [sic] per month, year after year on this," Southard testified: "Well, we had moved into the office. You don't want to end up moving twice in the same year. . . . We paid on time. I just didn't agree with the lease that was executed when I wasn't there. I didn't agree with the escalation. I didn't agree with the personal guarantee." *Id*. at 65-66. When asked if he ever agreed to the lease, he answered "I did not." *Id*. at 66.

[10] On October 2, 2019, the trial court issued findings of fact and conclusions which provided in part:

FINDINGS OF FACT

* * * * *

3. Brian Southard signed, or authorized the signature stamping of, the 2015 Restor lease agreement just as he had signed the 2013 Abelard lease agreement.

* * * * *

5. The defendant, Brian Southard, negotiated the terms of the 2015 lease agreement with Kenneth Keltner.

* * * * *

7. The 2015 lease was executed as acknowledged by Eric Keltner and Brian Southard, Brian Southard having asked Eric Keltner if he had gotten the lease. The Defendants occupied the business property

located at the Carmel Drive premises beginning January, 2015, and continuing through September 28, 2018.

8. The 2015 lease agreement identified both Restor and Brian Southard as the "Tennant" [sic] at the beginning of the agreement, and provided two signature blocks for the tenant to sign at the end. Only one signature block carried a signature, or signature stamp; the other was left blank. The block that was signed, or signature stamped, carried the apparent signature and name of Brian Southard. Notably, the signature (or stamp) of Brian Southard appeared exactly as did his signature on the 2013 lease agreement.

9. The Defendant Brian Southard denied signing the 2015 lease agreement and claimed that an employee of Restor, Becky Hintz / Heinz placed his signature stamp upon it without his authorization.

* * * * *

13. Brian Southard testified that he did not read the 2015 lease agreement.

14. Brian Southard also testified that he would never sign a lease agreement which contained a provision for annual rent increases.

15. Brian Southard testified that he did sign the 2013 lease agreement, which the Court finds did contain a provision for annual rent agreements.

16. In that respect, the Court finds the 2013 and 2015 lease agreements to be similar, if not identical, except as to the amounts of the increases. There was no explanation given at trial for the presence of the second signature box in the 2015 lease agreement.

17. The Defendants moved into the Carmel Drive premises in January, 2015.

18. The Defendant Brian Southard claimed that he did not know that his business had moved, that he had not agreed to move, and that the move was done, hurriedly, while he was "away". Nevertheless, he occupied the leased Carmel Drive premises.

\* \* \* \* \*

20. Kenneth Kellner and Brian Southard discussed the lease agreement and its rent increase provision in January, 2016. Brian Southard attempted to negotiate with Kenneth Keltner to forego increasing the rent. That attempted negotiation was not, the Court finds, successful.

21. Evidence was presented, and the Court finds, that there was $199,838.63 in unpaid rent . . . , and $3,200.00 in unpaid utilities . . . due and owing under the terms of the 2015 lease agreement.

\* \* \* \* \*

23. The Defendants did not leave the Carmel Drive premises "broom clean or in the same order and condition" in which they received them.

\* \* \* \* \*

26. The Defendants substantially changed the walls without the prior consent of the Plaintiff.

\* \* \* \* \*

28. The Defendants removed an outdoor sign, and did not repair damages resulting from that removal. . . .

\* \* \* \* \*

30. It stretches, if not is beyond, belief that a person of Brian Southard's business acumen did not either sign himself, authorize, or ratify and intend to be bound by the lease agreement at issue in this cause, when the Defendants occupied the leased premises for over a two and a half year period of time.

31. It stretches, if is not beyond, belief that any business tenant of any business acumen would ask a landlord if he had gotten a lease if he did not intend to be bound by it.

32. It stretches, if is not beyond, belief that any business owner would not know of the relocation of his business office from one place to another, or that such a move was done without his knowledge and/or consent, hurriedly, while he was "away".

33. The Court cannot find truth and/or veracity in much of the Defendant Brian Southard's testimony.

34. As to whether Brian Southard actually executed and/or authorized, or only ratified the lease agreement at issue, the Court finds [it] to be immaterial. Either actual execution and/or authorization, or ratification and acceptance of the lease agreement's benefits, binds the Defendants.

## CONCLUSIONS OF LAW

The Court wishes to make clear that at issue in this cause is one lease agreement and one lease agreement only: that entered into evidence . . . between the Keltner Property Group, LLC and Brian K. Southard and the Restor Company. Not at issue in this cause are seven or any other number of other cases in which the Defendant Brian Southard and/or any of his companies have been named as defendants. . . .

35. The Court finds Exhibit l-B [2015 lease] to be a valid and binding contract between Plaintiff and the Defendants.

36. The Court must ascertain and give effect to the intent of the parties to the contract in this case: the 2015 lease agreement.

37. The intent of the parties can be determined from the course of conduct of the parties, and/or their principals, over the course of time that the Carmel Drive premises were occupied by the Defendants, and by the comparison of the two lease agreements entered into evidence as Exhibits 1-A [2013 lease] and 1-B [2015 lease].

38. The Court concludes that Brian Southard, on behalf of, and as owner of, Restor, and personally himself, either signed the lease agreement, or authorized it to have been signature stamped. Southard acknowledged to Eric Keltner that it had been executed. Southard and Restor certainly ratified the lease agreement by accepting its benefits and occupying the Carmel Drive premises for the more than two and a half years that they occupied it.

39. The Court concludes that Southard did not limit his authorization and ratification of the lease agreement to Restor. Whether he signed the

agreement once or twice, he signed as himself, just as he had the Exhibit l-A prior lease agreement.

40. The Court concludes that under the valid lease between the Keltner Property Group, LLC and Brian Southard and Restor, the Plaintiff was damaged in the amount of $199,838.63 in unpaid rent, $3,200.00 in unpaid utilities, and $14,632.07 in restoring the Carmel Drive premises to the condition that the lease agreement required it to be at the conclusion of the lease.

*Id*. at 10-17. The court also ordered Defendants to pay attorney fees.

## *Discussion*

When a trial court enters findings of fact and conclusions thereon, findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Jernas v. Gumz*, 53 N.E.3d 434, 443 (Ind. Ct. App. 2016) (citing *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)), *trans. denied*. When a court has made findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. *Id.* First, it must determine whether the evidence supports the findings of fact, and second it must determine whether those findings support the conclusions. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.* We review questions of law *de novo*. *Id.* Interpretation of a contract

presents a question of law. *Id.* (citing *Stewart v. TT Commercial One, LLC*, 911 N.E.2d 51, 55 (Ind. Ct. App. 2009), *trans. denied*).

[12] Southard contends the unambiguous terms of the 2015 lease prove that he was not a tenant and the two parties to the agreement were Keltner Property and Restor. He argues that, while the lease "identified both Restor and Southard as Tenants," the "execution of the lease identifies a signature only for Restor, the corporate tenant, through the signature (or stamp) of Southard as 'Owner.'" Appellant's Brief at 13. He argues "[t]his, coupled with the presence of the blank signature block," proves as a matter of law that Keltner Property "expected the document to be executed by both tenants." *Id.* He further asserts "[t]he addition of a comma to separate the two tenants in the 2015 lease, when none separated the two tenants in the 2013 lease, coupled with the insertion of a second signature space in the 2015 lease when the 2013 lease had only one, indicate a change from the first to the second lease" and that the first lease "identified the two tenant parties as one tenant" whereas the second "identified them as two separate entities." *Id.* at 19. Southard also asserts that he, as an individual, did not ratify the lease.

[13] Keltner Property maintains the trial court's findings are not clearly erroneous, the 2015 lease named Southard as a tenant in the opening paragraph and included his social security number, and "[b]y naming both Southard and his company as a singular Tenant, the intention of the parties is to obligate both." Appellee's Brief at 14. It argues there was not a hurried negotiation and the lease was delivered to Southard months before it was signed. It argues there

was no need for Southard to sign twice, he signed only once to obligate himself and his company with respect to the 2013 lease, and the same applies with respect to the 2015 lease. It also asserts Southard ratified the 2015 lease, it would occasionally receive rent checks from another of Southard's companies, and "Restor Company" may have never existed. *Id*. at 22.

[14] Indiana courts have recognized the contractual nature of leases and the applicability of the law of contracts to leases. *Stewart*, 911 N.E.2d at 55 (citations omitted). If a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Jernas*, 53 N.E.3d at 444. Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. *Id*. We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id*. A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. *Id*. (citing *McDivitt v. McDivitt*, 42 N.E.3d 115, 117 (Ind. Ct. App. 2015) (a contract may be ambiguous if its terms are susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning), *trans. denied*; *Stewart*, 911 N.E.2d at 56). When interpreting an agreement, our paramount goal is to ascertain and effectuate the intent of the parties. *Id*. Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. *Id*. at 444-445 (citing *Lily, Inc. v. Silco, LLC*, 997 N.E.2d 1055, 1064 (Ind. Ct. App. 2013) (citing *Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010)), *reh'g denied*, *trans. denied*). When a

contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the finder of fact. *Id*. at 445 (citing *Lily*, 997 N.E.2d at 1064; *McDivitt*, 42 N.E.3d at 117).

[15] Contracts are formed when parties exchange an offer and acceptance. *Id.* A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract. *Id*. The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential terms of the transaction. *Id*. There must be mutual assent or a meeting of the minds on all essential terms in order to form a binding contract. *Id*.

[16] In general, a principal will be bound by a contract entered into by the principal's agent on his behalf if the agent had authority to bind him. *Heritage Dev. of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 889-890 (Ind. Ct. App. 2002) (citation omitted), *reh'g denied*, *trans. dismissed*. The agent's authority to enter into an agreement on the principal's behalf may be actual or apparent. *Id*. The question of whether an agency relationship exists and of the agent's authority is generally a question of fact. *Id*. "Ratification means the adoption of that which was done for and in the name of another without authority. It is in the nature of a cure for lack of authorization. When ratification takes place, the act stands as an authorized one, and makes the whole act, transaction, or contract good from the beginning." *Id*. at 889-890 (citation and brackets omitted).

[17] The record reveals the 2015 lease identified the tenants in its opening paragraph and stated: "THIS LEASE, entered into by the KELTNER PROPERTY GROUP, LLC, an Indiana limited liability company ('Landlord') and Restor Company an Indiana [corporation], & Brian Southard – Social Security No. [Redacted] Tenant." Plaintiff's Exhibit 1-B at 1. This language supports the conclusion that it was the parties' intent for Southard to be a tenant under the lease. Further, the trial court heard testimony regarding the relocation to the Carmel Drive premises, the preparation, delivery, and return of the written 2015 agreement, the extent of discussions or negotiations related to the lease, the extent payments were made under the lease, and the extent to which the premises were occupied and altered. The court found Southard's testimony to be largely not credible. Southard did not indicate that he requested a revision to the opening paragraph naming him as a tenant. The word "Owner" below Southard's signature and the placement of a comma between the two tenants' names in the opening paragraph, in light of the other language and evidence, do not require a finding that it was the parties' intent that Southard not be a tenant. While there were lines for an additional signature, the parties agree that Southard and his company Abelard were tenants with respect to the 2013 lease, Southard signed the 2013 lease once, and both the 2013 and 2015 leases identify Southard by his social security number and include Southard in the definition of "Tenant" in their opening paragraphs. Plaintiff's Exhibit 1-A at 1; Plaintiff's Exhibit 1-B at 1. Kenneth indicated Southard was writing checks from two different companies. Based on the evidence and the 2015 lease, we cannot say the record contains no facts to support the finding that there was an

understanding by the parties at the time of the agreement that Southard was a tenant under the 2015 lease or that we are left with the firm conviction that a mistake has been made. We conclude the trial court's findings and conclusions are not clearly erroneous.

[18] For the foregoing reasons, we affirm the judgment of the trial court.

[19] Affirmed.

Najam, J., and Kirsch, J., concur.