

FILED

Apr 26 2018, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Edward P. Grimmer
Daniel A. Gohdes
Edward P. Grimmer, P.C.
Crown Point, Indiana

ATTORNEY FOR APPELLEE

Paul B. Poracky
Koransky, Bouwer and Poracky, P.C.
Dyer, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bruce and Sybil Scheffer,

*Appellants-Plaintiffs,*

v.

Centier Bank,

*Appellee-Defendant.*

April 26, 2018

Court of Appeals Case No.
45A04-1709-PL-2118

Appeal from the Lake Superior
Court

The Honorable Diane Kavadias
Schneider, Judge

Trial Court Cause No.
45D11-1212-PL-106

**Brown, Judge.**

[1] Bruce and Sybil Scheffer appeal the trial court's order granting the motion for judgment on the evidence of Centier Bank ("Centier"). The Scheffers raise several issues which we consolidate and restate as whether the trial court erred in granting Centier's motion for judgment on the evidence and request for attorney fees. Centier requests appellate attorney fees and costs. We affirm the trial court's ruling on Centier's motion for judgment on the evidence and for attorney fees and remand for a determination of reasonable appellate attorney fees.

*Facts and Procedural History*

[2] This is the second appeal in this case. In December 2012, the Scheffers filed a complaint against Centier alleging that they had obtained a loan from Centier's predecessor, The First Bank of Whiting, in 1985 for the purchase of residential real property located on Wexford Road in Valparaiso, Porter County, Indiana, and that the loan had been secured by a mortgage on the real property and by an assignment of insurance policies on the Scheffers' lives. The life insurance policy assignments, which were dated in November of 1985 and attached to the complaint, provide: "It is understood that this assignment is for the sole purpose of using the policy as collateral security for existing or future loans made by the assignee to the owner." Appellants' Appendix Volume 2 at 35-36. The Scheffers alleged "[t]hat mortgage loan was the only loan that Scheffer had personally with Centier at that time of November 1985," "[t]he assignments were not given or received as collateral for any loan or debt obligation other than that mortgage loan on that residential property," and they paid Centier

"all remaining balances on that mortgage loan on or about December 17, 2010." *Id*. at 31. The Scheffers requested a judgment including an order that Centier execute releases of the assignments of the life insurance policies.

[3] Centier filed an answer denying that the life insurance policy assignments related in any way to a mortgage loan on residential real estate. Centier also stated that it entered into a mortgage and note on Wexford Road property in 2002 and that the loan had been paid off in December 2010, and it denied that the loan dealt with any type of mortgage or loan arrangement dating back to 1985. Centier also answered that it had not released the assignments of the life insurance policies because the loan obligations for which they served as collateral had not been satisfied.

[4] The Scheffers moved for summary judgment and designated their own affidavit which alleged that they had owned life insurance policies since 1985 and had assigned the policies as collateral on a promissory note and mortgage on their residential property in 1985. The Scheffers did not designate any documentary evidence of a 1985 residential mortgage or loan with Centier or its predecessor. Centier filed a response and cross-motion for summary judgment and designated the affidavit of Brian Miller, a vice-president for Centier, which stated that Centier had a business relationship with the Scheffers and Scheffer, Inc., dating before 1985; Centier did not have a residential mortgage loan on the Wexford Road property at that time; in 1985 the Scheffers as owners of Scheffer, Inc., assigned several life insurance policies to Centier as the assignee for the benefit of the commercial loan relationship between the parties; and that

the first residential mortgage relationship between Centier and the Scheffers regarding Wexford Road occurred in 2002. The trial court granted Centier's cross-motion for summary judgment and denied the Scheffers' motion for summary judgment. The Scheffers appealed, and Centier cross-appealed.

[5] On March 12, 2015, this Court issued a memorandum decision which reversed the trial court's entry of summary judgment. *See Scheffer v. Centier Bank*, No. 45A03-1410-PL-367 (Ind. Ct. App. Mar. 12, 2015). We acknowledged that the Scheffers designated no documentary evidence of a 1985 personal residential loan between the Scheffers and Centier or its predecessor that could have been connected with the life insurance policy assignments. We nevertheless noted that the Indiana Supreme Court had "recently clarified that even perfunctory, self-serving affidavits are enough to create a genuine issue of material fact for summary judgment purposes." No. 45A03-1410-PL-367, slip op. at 4 (citing *Hughley v. State*, 15 N.E.3d 1000, 1004 (Ind. 2014) (stating that "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims" and concluding that a designated affidavit was "sufficient, though minimally so, to raise a factual issue to be resolved at trial, and thus to defeat the State's summary-judgment motion"). We concluded that the Scheffers' affidavit, although lacking any documentary support, "was enough to create a genuine issue as to whether the assignments related to a 1985 mortgage on their personal residence rather than loans to their business, Scheffer, Inc.," and that consequently summary

judgment was improper. *Id.* at 5. We remanded to the trial court for further proceedings. *Id.*

[6] The trial court held a bench trial over several days in July and August of 2017 at which it admitted documentary evidence and testimony. The Scheffers introduced the life insurance policy assignments which indicated they were executed by them in November of 1985. The Scheffers also introduced a promissory note dated September 18, 2002, signed by them evidencing a loan from Centier in the original principal amount of $225,000 and a satisfaction of mortgage dated December 20, 2010, executed by Centier stating that this mortgage had been fully paid and satisfied and was released.

[7] The Scheffers then called their witnesses. Donald Kiszka testified that he worked for Centier Bank from 2008 until 2012 as a senior commercial workout or risk management officer. He indicated that, sometime around April of 2009, he began to work on Scheffer International loan accounts and that there were debts of Scheffer, Inc., that were owed to Centier. When asked if there was a line of credit, a commercial loan, and another commercial loan secured by a mortgage on the real estate of a commercial building, Kiszka replied that he believed he remembered that. He stated that he worked to maximize Centier's recovery from Scheffer, Inc., and that the recovery included an inventory and disposal of property in which Centier had a security interest. Kiszka testified that "key man insurance" is insurance which a "bank might typically take for collateral in order [to] recover money if the principal or key man in the business was no longer available for some reason, death, whatever." Transcript Volume

2 at 25. When asked if key man insurance is similar to life insurance assignments, Kiszka replied affirmatively. He stated that it is typical for banks to use life insurance assignments as collateral security to minimize the risk of default in the event of death of a key person. Kiszka indicated that the assignments in this case, by their language, secured any existing or future loans, and that, when a bank receives an assignment of a life insurance policy, the bank is the intended recipient of the benefit of the policy.

[8] Thomas Wilk testified that he joined Centier in 1994 and was a vice president and chief lending officer, that he was a commercial account officer for Scheffer, Inc., and that in 2009 the loans to Scheffer, Inc., went into distress. He indicated that the life insurance assignments do not mention Scheffer, Inc., or the words "commercial loans." *Id*. at 67. Wilk testified "[w]e regularly take assignments of life insurance to support business that – especially when you have individuals that are key people in running the company. So in the event that something were to happen to them, you would have the benefit of the life insurance policy." *Id*. at 53-54. When asked, "[i]f the only loans starting in 1983 through 1985 are commercial loans, no residential loans, can we assume that the language from the assignment that says 'existing loans' means commercial loans," Wilk responded "[y]es." *Id*. at 59. Wilk indicated there was no residential mortgage loan from Centier or First Bank of Whiting in November of 1985 for the Wexford Road property. He further testified that the commercial loans were also secured by business assets, equipment, inventory,

accounts receivable, intellectual property, general intangibles, and commercial real estate.

[9] Upon taking the stand, Bruce Scheffer indicated initially that the assignments "reference our residence in Valparaiso." *Id*. at 77. When asked the name of the first bank with which he did business "when [he] started in '78, '80," Bruce replied "American Trust and Savings of Whiting." *Id*. He stated that he stayed with American Trust and Savings of Whiting for the first few years and that he purchased the Wexford Road property in 1985. When asked if he had transitioned his banking relationship from American Trust and Savings of Whiting to First Bank of Whiting, he replied that he had a relationship with both banks. Bruce stated that he obtained a loan from Centier in 2002 which he used to refinance his Wexford Road house and that a satisfaction of mortgage instrument dated in 2002 indicated that a previous mortgage dated September 22, 1995, was satisfied. When asked where he obtained the financing for his house in 1985, he replied it was from First Bank of Whiting. He testified that he was asked to give the life insurance policies as extra collateral with the understanding the policies would be released when the house was paid off and that the house was paid off in 2010. The Scheffers also introduced evidence that they received notifications that the life insurance policies had been surrendered and distributed.[1]

---

[1] The notifications stated in part: "The above policy was assigned to Centier Bank and has been surrendered." Appellants' Appendix Volume 2 at 148-149.

[10] Centier's counsel then cross-examined Bruce who indicated that he and his wife were the sole owners and shareholders of Scheffer, Inc. He stated that he did not have any documents to support the claim that he entered into a residential mortgage with First Bank of Whiting in 1985. Centier's counsel asked Bruce if he had "ever done any banking transactions with Indiana Federal Savings and Loan Association out of Valparaiso, Indiana," and he replied "I may have." *Id.* at 126-127. When asked "[a]nd as you sit here . . . it's still your testimony, after all this time, that the financing of the house, which price you don't know, was done through First Bank of Whiting; is that right," Bruce replied "I don't recall." *Id.* at 127.

[11] Centier's counsel then introduced exhibits containing a warranty deed, a mortgage, and a satisfaction of mortgage, and the court admitted the exhibits. The warranty deed, dated July 22, 1985, evidences the conveyance of the Wexford Road property to the Scheffers, and a file-stamp on the deed indicates it was recorded with the Porter County Recorder on July 25, 1985. The mortgage was signed by the Scheffers and granted a security interest in the Wexford Road property to Indiana Federal Savings and Loan Association as the mortgagee to secure repayment of a debt of $175,000, and a file-stamp on the mortgage indicates it was recorded with the Porter County Recorder on July 25, 1985. Finally, the satisfaction of mortgage, dated January 19, 1987, states that the debt secured by the mortgage executed by the Scheffers in favor of Indiana Federal Savings and Loan Association in July of 1985 was paid and the mortgage was released.

[12]     Centier's counsel showed Bruce the warranty deed and mortgage in favor of Indiana Federal Savings and Loan Association recorded in July of 1985 and the following exchange occurred:

> Q. Now, go back to the first page, if you would, just to make sure we're talking about the right house. The house that's at issue in your verified complaint, what's the address?
>
> A. 504 Wexford.
>
> Q. And this warranty deed, which was issued based upon a promissory note and mortgage from Indiana Federal Savings and Loan Association, in July of 1985 is what house?
>
> A. Same.
>
> Q. The same house. So the information in your verified complaint, Mr. Scheffer, that's all a lie, isn't it?
>
> A. No. It's a mistake.
>
> Q. Oh, it's a mistake based on your belief; correct?
>
> A. Well, looking at this, this is a fact, all right, you didn't make this up. So I was going by my recollection 35 years ago without any files. And if it's a mistake, it's a mistake.
>
> Q. Well, sir, you filed a complaint, and you sued Centier Bank, and you've put them through four and a half, almost five years of litigation because you made a mistake?
>
>                                  * * * * *
>
> Q. So between the time of the deed being transferred to you, which was on July 22, 1985, through January 19th of 1987, you had a mortgage on your 504 Wexford property in Valparaiso, Indiana, with Indiana Federal Savings and Loan Bank; is that true?
>
> A. Yes.
>
> Q. Nothing with First Bank of Whiting, was there?
>
> A. No.

*Id*. at 130, 133.

[13]     Bruce acknowledged that the allegation in his complaint that he obtained a loan from the First Bank of Whiting in 1985 for the purchase of the residential property on Wexford Road was a mistake.  He also indicated that the allegation that Centier required the Scheffers to assign the life insurance policies as a term of that loan was a mistake.  When asked "you didn't have a lending relationship for 504 Wexford with the First Bank of Whiting on November 4th, 1985, did you," Bruce responded "I'll give you that."  *Id*. at 142.  When asked if he had commercial loans with First Bank of Whiting at that time, he replied that he believed he did.  He testified: "I made a mistake.  It was 35 years ago.  We're trying to guess.  I don't know what that – from that form, I can't tell, and you can't tell it, either . . . .  You cannot tell me of looking at that what that refers to."  *Id*. at 157.  Centier's counsel asked "[s]o you guessed in this case is what you're saying to the Court," and Bruce responded:

> It was my opinion.  It was not a guess.  It was an educated opinion.  We looked back 35 years ago.  We don't have any files.  We're saying what cost about that much in that time frame, and what was the possibility, and that's what we thought it was.
>
> All right.  You've got a horse on me.  All right.  It is not related to the house.

*Id*. at 158.  When asked "I just want to make sure I understand.  You're not claiming in 2002 there actually is a residential mortgage with Centier Bank that there were life insurance assignments made at that time, are you," Bruce answered "I'm not – no longer claiming that."  *Id*. at 158-159.

[14]    Centier filed a motion for judgment on the evidence. The motion asserted that there is no evidence that the Scheffers had a residential mortgage loan on their Wexford Road property with First Bank of Whiting at any time during 1985, that the Scheffers had a residential mortgage loan contract with Indiana Federal Savings and Loan Association on the house which transaction was consummated in July 1985, and that the life insurance assignments were given for commercial loans because those were the only type of loans the Scheffers had with First Bank of Whiting in 1985.

[15]    On August 17, 2017, the trial court issued an order granting Centier's motion for judgment on the evidence, providing in part:

> 9. Since the life insurance assignments did not serve as collateral for any mortgage with First Bank of Whiting in 1985, they were given to cover existing and future commercial loan obligations for their company, the only type of loan [the Scheffers] had with First Bank of Whiting in 1985.
>
> 10. In another lawsuit related to the commercial loans between the parties, Centier took cash surrender of the insurance policies prior to dismissal of its claims for the outstanding balance of those loans.
>
> 11. The Court was somewhat astonished when Mr. Scheffer acknowledged that the mortgage on the Wexler property was with Indiana Federal Savings and he had made a mistake.
>
> 12. His mistake was the very foundation of [the Scheffers'] claim. The Court finds it difficult to believe that such a successful businessman would not have accurate knowledge of his personal financial dealings.

13.  Upon Mr. Scheffer's testimony, the Court would have expected [the Scheffers] to come to Court today and dismiss their claim.

14.  [The Scheffers] have failed to sustain their burden of proof in their case in chief and judgment on the evidence is appropriate.

15.  This matter has pended since 2012 and has involved much court time and a great amount of attorney time and expense to both [the Scheffers] and [Centier].

16.  There was never a good faith basis to have proceeded with this lawsuit as no 1985 residential mortgage contract with First Bank of Whiting ever existed.

17.  The Court finds that [the Scheffers] brought this action in bad faith, and continued to maintain the action when it became clearly apparent that it was frivolous, unreasonable and groundless.

Appellants' Appendix at 24-26. Centier submitted an attorney fee request together with an affidavit of attorney fees and costs. The court issued an order awarding attorney fees to Centier in the amount of $68,731.98.

## Discussion

[16]  The Scheffers claim that the trial court erred in granting Centier Bank's motion for judgment on the evidence and ordering them to pay attorney fees. Ind. Trial Rule 50 provides that a motion for judgment on the evidence shall be granted "[w]here all or some of the issues in a case . . . are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it . . . ." Ind. Trial Rule 50(A). The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same as the standard governing the trial court in making its

decision. *Cavens v. Zaberdac*, 849 N.E.2d 526, 529 (Ind. 2006). Judgment on the evidence is appropriate where all or some of the issues are not supported by sufficient evidence. *Id*. "Where the issue involves a conclusion of law based on undisputed facts, the reviewing court is to determine the matter as a question of law in conjunction with the motion for judgment on the evidence, and to this extent, the standard of review is de novo." *Id*.

[17] The Scheffers assert that the cause of action before the trial court was conversion of the life insurance policies and that Centier did not produce any bank records showing that any corporate loan was secured by the life insurance policy assignments. They argue that the issue litigated was not whether there was a mortgage in 1985 but rather "whether Scheffers' ownership of the life insurance policies was, after December 17, 2010, subject to any security interest of Centier" and that "[c]entral to the analysis was . . . whether, under the language of the pled and attached [assignments], the assignment was limited to loans personal to the policy 'Owner', or the language was extensive enough to be assigned to secure debts of Scheffer, Inc." Appellants' Brief at 20. They contend that "[t]he Assignments were never amended to extend from loans to the owners to 'loans to the owners *as well as* their corporation.'" *Id*. at 21. They also argue that the argument advanced by Centier that the assignments may have been "key man" insurance is speculative.

[18] Centier maintains that, by providing the assignments, the Scheffers agreed to become sureties for existing and future commercial loans made to Scheffer, Inc., up to the cash surrender value of the policies. It argues that it, as the

assignee, had the right to direct the insurance company to provide the cash surrender value of the life insurance policies on default of payment.

[19] To the extent we must interpret the life insurance policy assignments and instruments admitted into evidence, we observe that, if the terms are clear and unambiguous, we must give those terms their clear and ordinary meaning. *Jernas v. Gumz*, 53 N.E.3d 434, 444 (Ind. Ct. App. 2016), *trans. denied*. We will make all attempts to construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. *Id.*; *see McDivitt v. McDivitt,* 42 N.E.3d 115, 117 (Ind. Ct. App. 2015) (observing that a contract may be ambiguous if its terms are susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning), *trans. denied*. When interpreting a contract, our paramount goal is to ascertain and effectuate the intent of the parties. *Jernas*, 53 N.E.3d at 444. This requires the contract to be read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* When a contract is ambiguous, extrinsic evidence may be examined to determine the parties' reasonable expectations. *McDivitt*, 42 N.E.3d at 117 (citing *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1310 (Ind. Ct. App. 1991) ("Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. If the ambiguity arises because of the language used in the contract and not because of extrinsic facts, its construction is purely a question

of law to be determined by the trial court.") (citing *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990)), *reh'g denied*, *trans. denied*).

[20] It is well settled that an insurance policy is a type of property which may be assigned as collateral. *Auburn Cordage, Inc. v. Revocable Tr. Agreement of Treadwell*, 848 N.E.2d 738, 750 (Ind. Ct. App. 2006) (citing *In re Estate of Devine*, 628 N.E.2d 1227, 1229 (Ind. Ct. App. 1994) (citing 43 AM. JUR.2d *Insurance* § 803 (1982))).[2]  When an insured assigns an insurance policy, the beneficiary is not divested of his or her general interest in the proceeds, but instead a lien is created in favor of the assignee to the extent of the debt owed.  *Id.* (citing *In re Estate of Devine*, 628 N.E.2d at 1229 (citing 43 AM. JUR.2d *Insurance* § 802) (1982)).[3]  Once the debt has been paid, the policy continues in effect as if there had been no assignment, and it is the assignee's duty to account to the beneficiary or the debtor's representative for the excess proceeds.  *Id.* (citations omitted).  An assignment of an insurance policy is to be construed in accordance with the intention of the assignor where ascertainable.  44 AM. JUR.2d *Insurance* § 796 (2018).  The course of conduct by the parties to the assignment may be relevant.  *Id*.  An assignment of a life insurance policy to a creditor as collateral security for a debt is valid to the extent of the debt.  44 AM. JUR.2d *Insurance* § 803 (2018).  Further, after an insured has made an absolute

---

[2] The Court in *Auburn* noted these sections may now be found at 44 AM. JUR.2d *Insurance* §§ 784-791 (2003). *See Auburn*, 848 N.E.2d at 750 n.15.

[3] The Court in *Auburn* noted this section may now be found at 44 AM. JUR.2d *Insurance* §§ 807, 809 (2003). *See Auburn*, 848 N.E.2d at 750 n.16.

assignment of a life insurance policy, the assignee is entitled to recover the cash surrender value of the policy by surrendering the policy to the insurer during the insured's lifetime. 44 AM. JUR.2d *Insurance* § 809 (2018). The assignee of a life insurance policy as collateral security has the right to surrender the policy and receive its cash value. *Id.*

[21] Turning to the life insurance policy assignments in this case, we observe that the Scheffers do not assert that they did not execute the assignments in 1985 or that the assignments were invalid. Rather, they challenge the scope of the debt the assignments were intended to secure. Centier elicited testimony from Wilk and from Bruce Scheffer that the Scheffers had not received a personal loan in connection with the purchase of the Wexford Road property from Centier or its predecessor in 1985. Further, Centier produced evidence of a mortgage executed by the Scheffers in favor of Indiana Federal Savings and Loan Association—not the First Bank of Whiting or Centier—which had been recorded on July 25, 1985, the same day the warranty deed conveying the Wexford Road property to the Scheffers was recorded, which secured repayment of the Scheffers' personal debt. The Indiana Federal Savings and Loan Association loan documents corroborate the testimony of Wilk, as ultimately acknowledged by Bruce Scheffer, that the Scheffers' residential loan in 1985 was not advanced by or secured by a residential mortgage in favor of the First Bank of Whiting.

[22] While the life insurance policy assignments do not expressly state that the policies secured the repayment of the debts of Scheffer, Inc., or other

commercial loans extended by Centier's predecessor, the language of the assignments is broad and states generally that the policies were intended to serve "as collateral security for existing or future loans made by the assignee to the owner." Appellants' Appendix Volume 2 at 71-74. To the extent the language is ambiguous as to whether the collateral was intended to secure the repayment of the debts of the Scheffers in their individual capacities only or of the Scheffers and the companies which they owned including Scheffer, Inc., we observe that the evidence presented at trial established that the Scheffers did not have a residential loan with Centier or its predecessor in 1985 when the assignments were executed as they alleged in their complaint and in fact did not have a residential loan with Centier until seventeen years later in 2002.

[23] In addition, the evidence established that the Scheffers were the sole shareholders of Scheffer, Inc., and that the commercial loans extended by Centier and its predecessor were also secured by business assets, equipment, inventory, accounts receivable, intellectual property, general intangibles, and commercial real estate. The court heard the testimony of Kiszka and Wilk regarding the function of life insurance policies on the lives of company owners or key persons serving as collateral or additional collateral to secure the repayment of commercial loans and the typical or customary practices of obtaining assignments of such policies by commercial lenders. The court also heard the testimony of Bruce Scheffer that his allegation that Centier required the life insurance policy assignments as a term of a residential loan in 1985 was a mistake and that he was no longer claiming that in 2002 there was a

residential mortgage with Centier for which he had made life insurance policy assignments.

[24] The language of the assignments together with the course of conduct of the parties established that it was the Scheffers' intention that the policies serve as collateral to secure the repayment of the loans advanced to them and their companies by Centier's predecessor which existed at that time and which would be subsequently advanced. It is clear that it was not their intent that the policies would secure solely the repayment of personal or residential debts which did not exist at the time and would not exist for seventeen years. The Scheffers did not produce evidence demonstrating that Centier as the assignee was not entitled to recover the surrender value of the life insurance policies. The trial court did not err in granting Centier Bank's motion for judgment on the evidence.

[25] In addition, the Scheffers challenge the trial court's award of attorney fees and argue that their claim was not frivolous and that the court's order does not identify when it should have been apparent their claim was frivolous. They also argue the affidavit of attorney fees is not sufficiently itemized. In response, Centier argues that the Scheffers' attorney should be jointly responsible to pay its attorney fees and expenses as there was never any support for the Scheffers' legal theory and the case should never have been filed, and it also requests appellate attorney fees.

[26] Ind. Code § 34-52-1-1 provides in part that the court in a civil action may award attorney fees as part of the cost to the prevailing party if it finds that either party brought an action or continued to litigate an action that is frivolous, unreasonable, or groundless or litigated the action in bad faith. With respect to an attorney fee award under Ind. Code § 34-52-1-1, we first review the trial court's findings of fact under the clearly erroneous standard, and we then review *de novo* its legal conclusions. *Knowledge A-Z, Inc. v. Sentry Ins.*, 857 N.E.2d 411, 423 (Ind. Ct. App. 2006), *reh'g denied*, *trans. denied*. We review the trial court's decision to award attorney fees and the amount of fees under an abuse of discretion standard. *Id.* A claim is frivolous under Ind. Code § 34-52-1-1 if it is made primarily to harass or maliciously injure another, if counsel is unable to make a good faith and rational argument on the merits of the claim, or if counsel is unable to support the action by a good faith and rational argument for extension, modification, or reversal of existing law. *Id.* at 424. A claim is unreasonable if, based upon the totality of the circumstances, including the law and facts known at the time of filing the claim, no reasonable attorney would consider the claim justified or worthy of litigation. *Id.* A claim is groundless if no facts exist which support the legal claim relied upon and presented by the losing party. *Id.* A claim is litigated in bad faith if the party presenting the claim is affirmatively operating with furtive design or ill will. *Id.*

[27] The trial court found there was never a good faith basis to have proceeded with this lawsuit as no 1985 residential mortgage with First Bank of Whiting ever existed and that the Scheffers brought the action in bad faith and continued to

maintain the action when it became clearly apparent that it was frivolous, unreasonable, and groundless. With respect to Bruce Scheffers's testimony the court also found it difficult to believe that such a successful businessman would not have accurate knowledge of his personal financial dealings" and that "[t]his matter has pended since 2012 and has involved much court time and a great amount of attorney time and expense." Appellant's Appendix at 26.

[28] The evidence establishes that the warranty deed conveying the property to the Scheffers and the mortgage signed by the Scheffers granting a security interest in the Wexford Road property to Indiana Federal Savings and Loan Association were both recorded with the Porter County Recorder on July 25, 1985, and thus the 1985 deed and mortgage have been part of the public record since that date. The Scheffers nevertheless filed this lawsuit, designated their own affidavit in response to Centier's summary judgment request stating that they had assigned the life insurance policies as collateral on a promissory note and mortgage on their residential property in 1985, and did not dismiss their action even after Centier produced evidence and Bruce Scheffer acknowledged that the life insurance policy assignments were not given in connection with a 1985 residential loan from Centier's predecessor. Bruce Scheffer testified in some detail regarding his business and various business dealings over the years. Based upon the evidence and testimony, we cannot conclude that the trial court's findings are clearly erroneous or that the court abused its discretion in ruling that an award of attorney fees in favor of Centier is appropriate.

[29] The affidavit of attorney fees produced by Centier's counsel is sufficiently itemized to assist the court in determining a reasonable amount of attorney fees. We have noted that the hours worked and the rate charged are a common starting point for determining the reasonableness of a fee. *Stewart v. TT Commercial One, LLC*, 911 N.E.2d 51, 59 (Ind. Ct. App. 2009). The affidavit states the total number of hours as 270.70, the rate as $250 per hour, and includes separate lines for legal research, postage, copies, and mileage. It alleges that the fees are reasonable based upon the attorneys' experience, skill required, and fees customarily charged in Lake County. The lawsuit has pended since 2012 and the total $68,731.98 fee awarded by the trial court appears reasonable.

[30] As for Centier's request for appellate attorney fees, Appellate Rule 66(E) provides in part that this court "may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." We may award appellate attorney fees in our discretion where an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003). To prevail on a substantive bad faith claim, a party must show that the appellant's contentions and arguments are utterly devoid of all plausibility. *Id.* We conclude that Centier has shown, based on the evidence as set forth above and in the record, that the Scheffers' appeal with respect to the trial court's ruling on its motion for judgment on the evidence is meritless. We remand for a determination of a

reasonable appellate attorney fee award under these circumstances. We decline to require the trial court to order that the Scheffers' attorney be held jointly responsible for an attorney fee award in favor of Centier.

## Conclusion

[31] For the foregoing reasons, we affirm the trial court's orders granting Centier's motion for judgment on the evidence and granting its request for attorney fees and remand for a determination of reasonable appellate attorney fees consistent with this opinion.

[32] Affirmed and remanded.

Baker, J., and Riley, J., concur.